SIDNEY COVICH *vs.* ANTHONY G. CHAMBERS
& another.[1]

Bristol. October 17, 1979. — November 27, 1979.

Present: GREANEY, ROSE, & PERRETTA, JJ.

*Practice, Civil,* Master, Counterclaim. *Contract,* Sale of real estate,
Rescission, Mistake.

Absent an order that a master file a transcript with his report, the
transcript is not part of the record on appeal. [741-743]
A plaintiff who failed to object before the trial judge to the standard
of proof applied by a master could not raise the objection for the
first time on appeal. [746-747]
In an action for rescission of a contract because of mutual mistake,
the master properly applied the test of clear and convincing proof
to the plaintiff's evidence. [747-748]
In an action for rescission of a contract because of mutual mistake,
the master's subsidiary findings fully warranted his conclusion
that the mistake was entirely unilateral and that the plaintiff had
assumed the risk of the mistake. [749-751]
Where a counterclaim which sought payment of the unpaid balance
on a note and fees and costs attributable to collection, although
filed after the conclusion of a master's hearings, was fully tried be-
fore a master by agreement of the parties, the judge properly
awarded attorney's fees attributable to collection of the note; fees
attributable to the defense of the action for rescission and cancella-
tion of the note were also properly awarded under the terms of the
note. [752]

BILL IN EQUITY filed in the Superior Court on April 29,
1974.

The suit was heard by *Welsh,* J., a District Court
judge sitting under statutory authority.

*Frank L. Kozol* (*Joel A. Kozol* with him) for the plain-
tiff.

[1] Anne M. Chambers.

*Charles E. Bennett* for the defendants.

GREANEY, J.  In June, 1973, the plaintiff Sidney Co-vich purchased land owned by the defendants in Mans-field, intending to construct a housing development.  His complaint sought cancellation of a note and mortgage given in connection with the financing of the sale on the ground of mutual mistake or fraud.  He also sought rescission of the purchase and reimbursement for over-payments made on the note because of an error in calcu-lating the land area conveyed by the deed.  The defend-ants admitted an error in the description of the land con-veyed, asked that the amount due on the note be reduced proportionately and counterclaimed for the proportional amount due and unpaid under the note.[2]  The dispute was referred to a master (Mass. R. Civ. P. 53, 365 Mass. 817 [1974]), who concluded that the sale was not vitiated by mutual mistake or fraud and that the defendants were entitled to the sum of $84,716 as the adjusted amount still owing on the note.  The master left the assessment of attorney's fees and costs under the note to the judge.  The judge overruled the plaintiff's objections to the report, ordered it adopted, and, after an eviden-tiary hearing, made an assessment of costs and attorney's fees on the note.  Judgment was entered ac-cordingly.  The plaintiff appeals, claiming that the master's general findings of no mutual mistake or fraud are not supported by the evidence, that the master ap-plied the wrong standard of proof in reaching his result, and that the judge erred in the award of counsel fees. We affirm the judgment.

1. *Procedural issue.*  The plaintiff has submitted as part of the appendix in excess of 150 transcript pages of

---

[2] These claims and admissions were contained in the defendants' amended answer, which was filed and allowed by the judge after the completion of the hearings before the master. However, by agree-ment of the parties, the hearing was conducted as if the amended pleadings had been filed in a timely manner. Mass. R. Civ. P. 15(b), 365 Mass. 761 (1974).

evidence before the master. He asks us to review this evidence and conclude that the master took an erroneous view of numerous questions of fact. This we decline to do. *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975). *Blakeley* v. *Pilgrim Packing Co.,* 4 Mass. App. Ct. 19, 20 n.2 (1976). In view of the recurring frequency of the reproduction on appeal of evidence before a master with the request that the master's findings be measured against the evidence, we reiterate that "absent an order that a master file a transcript with his report, such a transcript is not part of the record on appeal."[3] *Michelson* v. *Aronson,* 4 Mass. App. Ct. 182, 186 (1976). The proper method by which a party may preserve his right to raise the question whether the evidence was legally sufficient to support a master's findings of fact is precisely set forth in Rule 49, § 7, of the Superior Court, as amended (1976).[4] So far as the record discloses no requests for summaries of evidence were filed as required by the rule, nor did the plaintiff observe the procedures described in the rule as prerequisites for obtaining summaries. Bare unsupported objections to findings or statements in the objections that certain of the master's findings did not conform to the plaintiff's requested findings of fact are insufficient. Failure to follow the requirements of the rule confines review to matters apparent on the face of the report. See generally *Michelson* v. *Aronson, supra* at 190 (decided under the 1974 version of the rule). Requests to act otherwise seek to impose unwarranted burdens on trial and appellate courts and clash with the purpose of a master's referral

[3] The order of reference was in the usual form for a nonjury action and stated that the master "shall not file with his report a transcript of the evidence and of the proceedings." No motion was brought to permit the evidence to be reported. See *Shelburne Shirt Co.* v. *Singer,* 322 Mass. 262, 265 (1948), and cases cited.

[4] The 1976 restatement of rule 49, § 7, eliminated the need for preliminary objections before the master at the draft report stage but preserved in all essential respects the requirements for obtaining summaries of the evidence contained in its 1974 predecessor.

— "to have the facts settled . . . and to put the case in a position where nothing remains to be done except for the judge to apply correct principles of law to the facts found." *Shelburne Shirt Co.* v. *Singer,* 322 Mass. 262, 265 (1948). *Peters* v. *Wallach, supra* at 626.

2. *Master's findings.* When the evidence is not reported or otherwise summarized, the master's findings of fact are conclusive unless "they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law." *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 (1975), quoting from *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 825 (1973). *First Crestwood Corp.* v. *Building Inspector of Middleton,* 3 Mass. App. Ct. 234, 235 (1975). In this light we summarize the master's material findings.

Anthony G. Chambers and his mother owned two parcels of agriculturally zoned land in Mansfield, the first containing 10.59 acres, the second containing approximately fifty acres. They had inherited the land from Chambers' father, who had entered a contract with a construction company for the sale of gravel from the fifty-acre parcel. The zoning board of appeals granted a permit with conditions [5] for the removal of the gravel, and the construction company filed a $40,000 performance bond. In 1968, upon completion of the gravel removal, the performance bond was released.

Chambers' mother lived on the smaller parcel, but Chambers himself was a Connecticut resident who only visited the site once or twice during the gravel removal operations. Chambers and his mother authorized a family friend, one Alpert, to act as a finder for the sale of the

---

[5] The master incorporated the special permit decision in his report. In pertinent part it required that the grades be left at a level shown on a contour map and that "it shall be covered to a minimum depth of 2, with topsoil of sufficient quality to support vegetation. The whole area shall then be seeded to prevent dust and erosion so as to leave the land in a condition no less suitable for development than it was fore the commencement of the operation."

fifty-acre parcel. Alpert was only authorized to convey offers, and he was given no authority to negotiate or bargain for the sellers.

Covich is an experienced builder and developer of commercial and residential properties who had previously developed a single-family residential subdivision in Mansfield. In the spring of 1972 Covich became interested in the Chambers property. He approached Alpert, who arranged a meeting between Covich and the sellers, at which time an offer to purchase was made by Covich but not accepted.[6] Ten months of negotiations ensued, culminating in the signing of a sale agreement on February 12, 1973, for the fifty-acre parcel at a price of $2,500 per acre.

Before he entered the agreement, Covich engaged a registered engineer and surveyor who had been a member of the Mansfield planning board during the period of the gravel excavation and who was aware of its removal. The engineer searched the records of the zoning board for the contour map referred to in the special permit (note 4, *supra*) but was unable to obtain it because the records had been destroyed by a fire. He also walked the perimeter of the land in early 1973 and knew on his first inspection that fill would be needed for certain lots. The engineer prepared a preliminary plan prior to the closing and discovered that the proposed form of deed overstated the area of the property by about five acres.[7] Prior to signing the sale agreement, Covich had also walked the

---

[6] The master incorporated into his report "a copy of a document that purports to embody an offer to purchase approximately 50 acres of land at $2,200.00 per acre . . . signed by Covich July 2, 1972, but not by [Mrs.] Chambers who is described as the seller." This offer stated that it was subject to several conditions to be performed by seller, including "[p]ercolation tests adequate for the development of said property as a subdivision." The purchase and sale agreement between the parties, which was also incorporated into the master's report, did not contain this provision.

[7] The parties agreed that the conveyance from the defendants to the plaintiff comprised 49.88 acres.

boundaries with his engineer and knew that gravel had been removed from the property. The master found that Covich made a conscious choice not to dig test holes or to perform percolation tests to determine the water table, although he had done so in other developments and would not have been prevented from so doing on this tract. The master also observed on his view a swamp in the southeast section of the land. The master found that Chambers knew that the performance bond had been released but that Covich was unaware of its release before he agreed to purchase the property. He also found that Chambers did not rely on the bond's release or performance of the conditions of the permit in entering the contract.

A closing took place on June 1 or 4, 1973, during which Chambers and his mother, for consideration of $137,875, sold to Covich a parcel of land "containing 55.15 acres more or less." Covich paid $39,984 including the original deposit in cash, and executed a promissory note for $97,891, secured by a mortgage on the land.[8]

In December, 1973 (six months after the closing), Covich dug test holes on the property. In the holes dug, the water table varied from six inches to thirty-four inches below the surface. This did not meet the minimum depth requirement of the State Sanitary Code that ground water disposal fields should not be constructed in areas where the maximum ground water elevation is less than four feet below the bottom of the disposal field. The parties stipulated that prior to the date of the agreement 497,168 cubic yards of gravel had been removed from the land and that Chambers was aware of this removal. Without considering the fill necessary for the roads, it was estimated that 150,000 cubic yards of fill would be necessary to make forty to forty-five buildable lots.[9]

---

[8] In recognition of the error in the acreage actually conveyed, the parties agreed that in the event of liability the correct amount due and unpaid on the note would be $84,716.

[9] Covich had originally prepared a topographical plan which laid out fifty-eight lots and various roads for the proposed subdivision.

Although he concluded that Chambers knew about Covich's plan to develop the property prior to signing the sale agreement, the master found "no evidence that . . . Chambers was aware of the water table problem or that he had enough knowledge so that he was put on notice that a water problem existed." He found that "it is good engineering practice to dig test holes to find the water table before purchasing land, a step which plaintiff failed to take." He detected no evidence that either Chambers or his mother made a false representation as to the property upon which Covich could have relied. He concluded that there was no evidence of reliance on the gravel permit or the bond prior to the parties' entering the contract and that no mutual mistake had occurred.

3. *Standard of proof.* Relying on certain gratuitous language in the report,[10] the plaintiff claims that the master erroneously replaced the usual preponderance standard with one of proof "beyond doubt" as the measure of evidence justifying rescission for mutual mistake. We reject this argument.

We note first that the plaintiff filed a list of specific objections to the report. None of the objections brought to the judge's attention the current claim as to the standard of proof. An objecting party has the duty of alerting the judge to those specific parts of the report he questions, because "[t]he report clearly [is] not objectionable as a whole . . . [and the judge] could not be required to assume the burden of separating the good from the bad." *Hill* v. *Associated Transp. Inc.,* 345 Mass. 55, 58 (1962) (defendant unsuccessfully sought to have the report expunged in its entirety on the ground that there was error in the standard of care applied by the auditor). The rules

---

[10] The report concluded with the following dicta: "Bills for fraud, cancellation, reformation and rescission require proof 'beyond doubt' . . . . Proof must be 'beyond a reasonable doubt' which is not the same as Criminal Standard . . . 'clear and convincing evidence.'" As to the propriety of this type of material in a report, see *Ross* v. *Broitman,* 338 Mass. 770, 771-772 (1959); *Pietrazak* v. *McDermott,* 341 Mass. 107, 109 (1960).

governing master's reports in non-jury actions also specifically require that the objections "clearly" state their grounds, a requirement that forecloses objections that have not been expressed to the judge reviewing the report. Mass.R.Civ.P. 53(e)(2), 365 Mass. 820 (1975). See also *Freitas* v. *Olson & Appleby, Inc.,* 4 Mass. App. Ct. 801 (1976). This misstep adversely affects the plaintiff's right to raise the claim here.

However, we think the master was correct in applying the stricter test of clear and convincing proof to the plaintiff's evidence.[11] When reformation of a written contract is sought for mistake, it is established that "[r]eformation will not be decreed unless the facts required for such a decree are proved convincingly and to the entire satisfaction of the court. A preponderance of the evidence is said not to be enough." 3 Corbin, Contracts § 615, at 743 (1960). Accord, *Stockbridge Iron Co.* v. *Hudson Iron Co.,* 107 Mass. ·290 (1871); *Kidder* v. *Greenman,* 283 Mass. 601, 614 (1933); *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 870, n.10 (1975); 9 Wigmore, Evidence § 2498(3) (3d ed. 1940). "And the principle applies where cancellation for such a mistake is sought." *Kidder* v. *Greenman, supra* at 613. *Stone* v. *Essex County Newspapers, Inc., supra* at 870 n.10. As Professor Corbin points out, the rule derives from the fact that "[t]he document itself, duly executed and introduced in court, has weight as evidence of mutual agreement. If supported by one party's testimony that there was no mistake of the sort justifying reforma-

---

[11] A close reading of the master's findings indicates that his comments on the standard of proof may have been extraneous to his decision. Having stated in the report that there was *no* evidence to support certain of the plaintiff's allegations, including the crucial issue of reliance by both parties on the release of the performance bond, the master concluded that the "[e]vidence does not warrant a finding of mutual mistake, especially where the proof must be more than a preponderance of evidence." The findings as a whole indicate that the master felt that the plaintiff did not prove his case under any legal standard, let alone the higher standard the master believed to be appropriate.

tion . . . the testimony of the other party must be well sup-
ported in order to overcome the weight of the evidence
against him." 3 Corbin, Contracts, *supra* at 745-746. This
is also generally the rule in the Restatement (Second) of
Contracts.[12]  All of these are expressions of standards
designed in the last analysis to impress upon the trier of
fact the special degree of attention, care, and scrutiny
that he must bring to the evidence before finding for a
party seeking nullification of a written agreement.  See
generally *Stone* v. *Essex County Newspapers, Inc., supra*
at 876 (Quirico, J., dissenting in part).

The plaintiff claims that there was "a basic assumption
on which the contract was made" concerning which both
parties were mistaken.  See *Dover Pool & Racquet Club,
Inc.* v. *Brooking,* 366 Mass. 629, 633 (1975).  This is tanta-
mount to an assertion that the parties did not have a
meeting of the minds.  In such a case it was incumbent
upon the plaintiff when faced with the fully integrated
agreement to establish his theory by a measure of proof
that convinced the master that the parties had never
agreed on certain essential terms.  The master's approach
to the dispute displayed an adequate grasp and applica-
tion of the principles governing the standard of proof.

---

[12] Restatement (Second) of Contracts § 297, Comment c (Tent. Draft
No. 10, 1975) provides: "*Proof Required.*  Because experience teaches
that mistakes are the exception and not the rule, the trier of the facts
should examine the evidence with particular care when it relates to a
party's assertion of mistake as the basis for his claim or defense.  Care
is all the more necessary when the asserted mistake relates to a
writing, because the law of contracts, as is indicated by the parol
evidence rule and the Statute of Frauds, attaches great weight to the
written expression of an agreement. This is commonly summarized in
a standard that requires the trier of the facts to be satisfied by 'clear
and convincing evidence' before reformation is decreed.  Each case
must, however, turn on its particular facts, and the evidentiary
weight to be attached to a writing will depend, in part, on its inherent
credibility in the light of those facts.  Once the court is convinced that
the writing fails to express the agreement of the parties, the writing
loses its usual evidentiary effect with respect to other matters, such
as the ascertainment of the parties' actual agreement."

4. *Elements of mutual mistake.* The plaintiff claims that the master's conclusion that a mutual mistake had not occurred "was based upon a fundamental misconception and misunderstanding of the legal principles applicable" and that his subsidiary findings compel a general finding of mutual mistake. To the contrary, we conclude that the subsidiary findings inexorably lead to the result reached by the master: that any mistake was entirely unilateral and that the risk was assumed by Covich.

A recent distillation of the principles concerning the doctrine of mistake is contained in the Restatement. "A mistake is a belief that is not in accord with existing facts." Restatement (Second) of Contracts § 293 (Tent. Draft No. 10, 1975). "Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake. ..." Restatement (Second) of Contracts, *supra* § 294. "A party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates, but treats his limited knowledge as sufficient ...." Restatement (Second) of Contracts, *supra* § 296. Our cases are substantially in accord with these rules. See *Spurr* v. *Benedict,* 99 Mass. 463, 466 (1868); *Kyle* v. *Kavanagh,* 103 Mass. 356, 359-360 (1869); *Jeselsohn* v. *Park Trust Co.,* 241 Mass. 388, 392 (1922); *White* v. *White,* 346 Mass. 76, 80 (1963); *Dover Pool & Racquet Club, Inc.* v. *Brooking, supra* at 632-634. While it is clear that a party seeking rescission need not show even an innocent misrepresentation of some material assumption which forms the basis of his bargain in order to make out a case of mutual mistake of fact (*White* v. *White, supra* at 80), it is also elementary that both parties must share the erroneous state of mind as to the basic assumption on which the contract was

made.[13] *Dover Pool & Racquet Club, Inc.* v. *Brooking, supra* at 632-633, and cases cited. See also *Taylor* v. *Buttrick,* 165 Mass. 547, 548-549 (1896). Avoidance is not permitted just because one party is disappointed in the hope that the facts accord with his wishes.

In this case the master's internally consistent subsidiary findings and reasonable inferences which we may draw therefrom (*Bills* v. *Nunno,* 4 Mass. App. Ct. 279, 283-284 [1976]) establish that it was Covich, not Chambers, who was an expert on land development; that Covich approached the finder and pursued the purchase of the land; that neither party relied upon the release of the performance bond as a basis for entering the contract; and that Covich was unaware of the release until after he offered to purchase the land. In light of his written offer, which would have required Mrs. Chambers to undertake percolation tests, we think two inferences are compelling: that Covich did not rely on anyone else's knowledge, representations or belief as to the controlling facts concerning the water table; and that in failing to insert a similar condition in the purchase and sale agreement, Covich voluntarily assumed the risk as part of his bargain that the land might not have adequate drainage for the necessary septic systems. Further findings which buttress the master's conclusion that the mistake, if any, was unilateral or the risk assumed, include ones to

---

[13] A party may avoid a contract for unilateral mistake only if he does not bear the risk of the mistake and the other party either knows of his mistake or the mistake has the effect of rendering the contract unconscionable. Restatement (Second) of Contracts § 295 (Tent. Draft No. 10, 1975). Historically, a bargain was considered unconscionable if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Hume* v. *United States,* 132 U.S. 406 (1889), quoting *Earl of Chesterfield* v. *Janssen,* 28 Eng. Rep. 82, 100 (Ch. 1750). Later, a contract was determined unenforceable because unconscionable when "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." *Campbell Soup Co.* v. *Wentz,* 172 F.2d 80, 84 (3d Cir. 1948). See Restatement (Second) of Contracts § 234 (Tent. Draft No. 5, 1970).

the effect that Chambers would not have understood the importance of the water table had he known about it; that the presence of a swamp in one section of the parcel was readily apparent (which could have put both the engineer and Covich, but not Chambers, on notice of a high water table); that the engineer knew from his first inspection that at least some of the parcels required fill; that Covich himself usually took the precaution of making certain simple tests for water table level before purchasing land; that it was good engineering practice to make these tests; and that it was Covich who decided not to do so. This is not a case like *Dover Pool & Racquet Club, Inc.* v. *Brooking, supra,* where both parties recognized the importance of the zoning ordinance to the buyer's proposed use and were simply mistaken as to a change in applicable zoning regulation. Nor is it a case like *White* v. *White, supra,* where neither party intended the result that their choice of language produced. Neither party to a contract can rescind it "because the known and assumed risk turned out to be greater than either or both expected it to be." *Cook* v. *Kelley,* 352 Mass. 628, 632 (1967), quoting from *Aldrich* v. *Travelers Ins. Co.,* 317 Mass. 86, 88 (1944). Leaving these contracts intact will not produce an unconscionable result, and Covich has not demonstrated that it is impracticable for him to perform or that the purpose of the contract has been frustrated in a sense sufficient to provide a remedy. See generally Restatement (Second) of Contracts §§ 281 and 285 (Tent. Draft No. 9, 1974). Both the master and the judge correctly concluded that this was a case of "conscious ignorance or deliberate risk taking on the purchaser's part" (*Dover Pool & Racquet Club, Inc.* v. *Brooking, supra* at 637), a situation which precludes relief. As Mr. Justice Sutherland observed, "whether the agreement was made reluctantly, or appellant got the worst of the bargain, are matters unnecessary to be considered. It is enough that, without fraud [mistake] or coercion, [he] did agree." *Savage Arms Corp.* v. *United States,* 266 U.S. 217, 221 (1924).

5. *Attorney's fees and costs.* Covich's final argument challenges the validity of the judge's award of attorney's fees on the note. The note provides for attorney's fees incurred in the collection of any unpaid balance due. When the claims were brought, the first installment was not yet due; thereafter, it became due and was not paid. The counterclaim which sought payment of the unpaid balance on the note and fees and costs attributable to collection, although filed after the conclusion of the master's hearings, was fully tried before the master by agreement of the parties. We find no merit in the plaintiff's argument that because the counterclaim was filed after the hearings concluded, collection of the sums due under the note was not in issue. The argument overlooks the manifest purpose of permitting the evidence pertaining to the counterclaims to be heard with the merits of the original complaint — "to effectuate the settlement in one proceeding of controversies so closely connected as appropriately to be combined in one trial in order to prevent duplication of testimony, to avoid unnecessary expense to the parties and to the public, and to expedite the adjudication of suits." *Potier* v. *A.W. Perry, Inc.*, 286 Mass. 602, 608 (1934). *Stubbert* v. *Sergio*, 335 Mass. 91, 93 (1956). We also conclude that fees attributable to the defense of the rescission and cancellation actions were properly awarded under the terms of the note because the successful resistance of these claims was intrinsic to establishing a default on the note as a predicate for its collection. Finally, there was competent evidence in support of the judge's assessment of the fees in keeping with standards set out in *Cummings* v. *National Shawmut Bank*, 284 Mass. 563 (1933), and *Perkins* v. *Blake*, 3 Mass. App. Ct. 415, 418 (1975), and the record reveals no arbitrariness, injustice or abuse of discretion in the amount of the award.

*Judgment affirmed.*