ELWYN LAWTON *vs.* JAMES DRACOUSIS & another.[1]

Worcester. March 15, 1982. — July 16, 1982.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Fraud. Contract*, Sale of real estate, Rescission. *Consumer Protection*, Unfair act or practice.

In an action by the buyer of an apartment building against the seller and a real estate broker seeking damages and rescission of the sale on the basis of misrepresentations that the structure was in compliance with the State building code, the judge's warranted findings that neither defendant had made any misrepresentations to the plaintiff regarding violations of the code reported by the building inspector to a previous owner in 1973; that neither defendant knew or had reasonable grounds for believing that the violations were outstanding when the plaintiff purchased the structure in 1977; and that the defendants had exercised reasonable care in relying on statements by the municipal building inspector prior to the sale, as to the extent of code violations, precluded rescission of the sale or recovery on either the theory of misrepresentation or violation of G. L. c. 93A. [168-172]

In the circumstances, including the absence of wrongdoing by the seller of real estate and a broker, no justification existed for allowing rescission of the sale on the basis of mutual mistake respecting compliance with the State building code. [172-173]

CIVIL ACTION commenced in the Superior Court Department on February 21, 1980.

The case was heard by *Dimond*, J.

*Vincent Pusateri* for the plaintiff.

*Guido B. DiSciullo* (*Philip E. Pofcher* with him) for James Dracousis.

*Joseph S. Smith* (*Claudia J. Billings* with him) for Girard J. Godin.

_____

[1] Girard J. Godin.

PERRETTA, J.  The plaintiff buyer (Lawton) brought an action against the defendant seller (Dracousis) and the defendant broker (Godin), alleging that they had induced him to buy Dracousis' property by representing that there were no existing State building code violations affecting the building in dispute, when, in fact, there were.  Lawton sought damages for deceit and violations of G. L. c. 93A, as well as rescission of the sale.  Dracousis counterclaimed for monies owed by Lawton on his second mortgage promissory note. The trial judge found that neither Dracousis nor Godin had deceived Lawton and entered a judgment in their favor. We affirm.

1. *The Evidence.*

We relate the testimony presented at trial as it appears from the designated portions of the transcript reproduced in the record appendix and as supplemented by the documentary evidence.  The property in question is an apartment building, located in Athol, which one Vernon B. MacDonald (MacDonald) and his wife purchased in 1971.  The MacDonalds sold the property to Dracousis on August 12, 1974; Dracousis sold it to Lawton on July 22, 1977.  Godin was the broker in connection with the 1974 and 1977 sales.

On May 31, 1973, Paul Fredette (Fredette), a State building inspector assigned to the Worcester regional office of the Department of Public Safety (Department), inspected the building and found certain State building code violations. Fredette wrote to MacDonald on June 1, 1973, giving him notice that "[t]o comply with minimum safety requirements the following corrections should be implemented . . . ." Fredette set out, in mandatory language, a list of changes to be made in the exit stairways, the boiler room, and other parts of the building.  The notice did not, however, specify or make reference to any particular provision of the State building code.  Three copies of the notice to MacDonald were kept on file: one in the Worcester regional office, one in the Department's main office in Boston, and one in Fredette's own file.

On January 1, 1975, by reason of St. 1972, c. 802, §§ 15, 16, and 77, amending G. L. c. 143, §§ 3 and 3A, a new State building code came into effect, transferring the responsibility for the inspection of buildings and the enforcement of the State building code from the Department to local city and town inspectors.[2]  State building inspectors were to function in supervisory and advisory capacities.

In transferring his files to the local Athol building inspector, Fredette made no specific reference to his 1973 notice to MacDonald, and in receiving Fredette's files, the local inspector never indexed or otherwise catalogued the materials. Although Fredette remained at the Worcester regional office, he made no inquiry nor took any action concerning compliance with his 1973 notice until 1979, when there was a fire in the building.  As the trial judge aptly observed, the 1973 notice was "simply lost, forgotten and buried."

MacDonald testified that after he received Fredette's notice in June, 1973, he decided to sell the property.  He telephoned Godin and told him about the violations.  MacDonald also testified that he showed Fredette's notice to Dracousis and Godin, both of whom contradicted MacDonald and testified that they never saw the 1973 document until 1979.  At that time, Lawton brought it to their attention in anticipation of this law suit.

Godin stated at trial that he knew of the existence of the code violations in 1973 through a telephone conversation with MacDonald.  MacDonald told him that there were violations, saying (in Godin's words), "[P]rimarily, it was the boiler room . . . and there were some doors and locks and things of that nature."  Godin related that the violations were brought to Dracousis' attention and that Dracousis inspected the property with MacDonald before buying it. Dracousis testified, however, that prior to purchasing the property, he was unaware of the existing violations which were first brought to his attention by Lawton in 1979 or 1980.

---

[2] The conclusion we reach makes it unnecessary for us to consider what effect, if any, St. 1972, c. 802, had on Fredette's notice to MacDonald.

The building was again inspected on May 20, 1976, while Dracousis owned it, by the Athol building inspector, one Ralph Meagher. In a notice dated May 21, 1976, Meagher informed Dracousis that "[t]he following violations were found and must be corrected." Of the violations recited, some involved trash and debris removal. Others required that: "(1) The boiler and boiler room ceiling must be re-patched . . . . (3) On the fourth floor — bars must be placed over the window in stairwell. . . . (6) Either fill in or make a platform around sprinkler valve. . . . (7) Nail all doors to the elevators shut." When Dracousis decided to sell the property, he had made some but not all of the corrections ordered by Meagher.

Godin related that when he and Lawton were attempting to secure financing from a bank for the purchase of the property, the bank officers indicated that they wanted to be sure that the building was clear of any building code viola-tions. Because he had no personal knowledge of the code status of the building, Godin proceeded, with Lawton, from the meeting at the bank to the Athol building inspec-tor's office. There they spoke with Meagher, and Godin asked him if there were any outstanding violations affecting the building. A folder was pulled by Meagher or his secre-tary, and Meagher's 1976 letter to Dracousis was produced.

The testimony of Dracousis, Godin and Lawton is in agree-ment on the fact that prior to purchasing the property, Lawton went through the building with Dracousis, and they went over Meagher's list. Dracousis told Lawton what corrections had and had not been made.

Lawton stated that he asked both Dracousis and Godin whether any violations in addition to Meagher's list existed and that both men told him "no." When questioned by Lawton's attorney as to why they never told Lawton about the 1973 violations, Dracousis responded that he never knew about them until Lawton told him. Godin explained, many times and all to the same effect, that in showing the building for Dracousis over a period of about one year, he never mentioned the 1973 violations to prospective buyers

"because the violations were in 1973" and "[s]everal years had passed."

Lawton, who purchased the property on July 22, 1977, was issued a certificate of inspection by Meagher on September 29, 1977. In April of 1978, Meagher was replaced by one Adrian Van Os, who issued Lawton a certificate backdated to September 29, 1977, which certified that he, Van Os, had inspected the building. Van Os testified that he never inspected the building until after the fire. He also related that he did not find Fredette's 1973 notice in the office file dealing with the property; rather, he found it in one of his desk drawers.

2. *The Findings.*

The trial judge found that when Godin handled the 1974 sale for MacDonald, MacDonald told Godin "in a general way that certain 'violations' concerning the boiler room, doors and locks had been found on the property. No specific reference, however, was made to Fredette's notice." Having rejected MacDonald's testimony in favor of Godin's, the trial judge went on to state that "[i]t is fair to conclude, and I find, that Godin informed Dracousis generally of the existence of 'violations.'" This finding constitutes a disbelief of Dracousis' testimony that he did not know of the 1973 violations until 1979 or 1980. Lawton argues that this finding is unsupported by the evidence and, thus, clearly erroneous. He contends that if Dracousis' testimony is rejected, all that remains is "the testimony of MacDonald, supported by Godin, that Dracousis knew exactly what the violations were."

We find nothing in the designated portions of the transcript which supports Lawton's characterization of Godin's testimony concerning Dracousis' knowledge. When Lawton's attorney asked Godin whether he knew if anyone had ever taken any corrective action on the 1973 violations, Godin responded only that he did not know "but they were brought to the attention of Mr. Dracousis."

We have consistently "emphasized that it is the trial judge who, by virtue of his firsthand view of the presentation of

evidence, is in the best position to judge the weight and credibility of the evidence." *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). This is far from the type of case which would justify our incursion upon the "preserve of the trial judge." *Springgate* v. *School Comm. of Mattapoisett*, 11 Mass. App. Ct. 304, 310 (1981). We are bound by the findings of fact which are supported by the evidence, which includes inferences reasonably drawn therefrom. *T.L. Edwards, Inc.* v. *Fields*, 371 Mass. 895, 896 (1976). See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 430-431 (1980). "The permissible drawing of an inference by [the finder of facts] is a process of reasoning whereby from facts admitted or established by the evidence, . . . or from common knowledge and experience, a reasonable conclusion may be drawn that a further fact is established." *Semerjian* v. *Stetson*, 284 Mass. 510, 514 (1933). Based upon a review of the designated portions of the testimony, we cannot say that the trial judge's finding that "Godin informed Dracousis generally of the existence of 'violations,'" which rests upon direct evidence and reasonable inferences, is clearly erroneous; that is, we do not have a firm conviction that the trial judge made a mistake. See *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 161 (1977), and cases therein cited.

The same must be said for the trial judge's findings concerning the 1976 violations. On this point, he found: "Godin, who was now the broker for Dracousis, was aware of Meagher's notice but reasonably assumed in good faith that it covered the violations that MacDonald had mentioned generally in 1974. Dracousis similarly made a like assumption reasonably and in good faith."

Lawton attacks these findings because neither Dracousis nor Godin gave direct testimony that they had assumed Meagher's notice included the earlier 1973 violations. These findings, however, reasonably flow from the trial judge's subsidiary findings that: (1) Godin and Dracousis had only general and not specific knowledge of the 1973 violations;

(2) Godin suggested that he and Lawton go to the building inspector's office; (3) Godin asked Meagher whether there were any State building code violations affecting the property; (4) Meagher produced only his 1976 notice to Dracousis; and, (5) Dracousis and Lawton, prior to the sale, went through the building with an eye to Meagher's list.

Upon these subsidiary findings, the trial judge found generally that: "[N]either Godin nor Dracousis made any misrepresentation, express or implied, to Lawton relative to the violations cited by Fredette in 1973, nor did either of them know or have reasonable grounds for believing that any such violations may have been outstanding in 1977." These subsidiary and general findings are not clearly erroneous, and we turn to consider whether the trial judge applied relevant legal principles in reaching his conclusion that Dracousis and Godin were not liable to Lawton. *First Natl. Bank* v. *Brink*, 372 Mass. 257, 263 (1977).

3. *Misrepresentations.*

Citing *Yorke* v. *Taylor*, 332 Mass. 368 (1955), and *Kannavos* v. *Annino*, 356 Mass. 42 (1969), Lawton argues that the trial judge erroneously concluded that a good faith mistake excuses a misrepresentation caused by nondisclosure. This contention is irrelevant because the trial judge found that neither Dracousis nor Godin knew that the 1973 violations were outstanding. See Restatement (Second) of Contracts § 161, Comment b (1979) ("The notion of disclosure necessarily implies that the fact in question is known to the person expected to disclose it"). See also Prosser, Torts § 106 (4th ed. 1971).

Nor can liability be predicated upon any notion of innocent misrepresentations, because, as found by the trial judge, no representations concerning the 1973 violations were made by either Dracousis or Godin. See Restatement (Second) of Torts § 552C(1), Comment e (1977) ("In order for the rule stated in this Section to apply there must be a misrepresentation of fact, express or implied"). See also Prosser, Torts § 107; Williston, Liability For Honest Misrepresentations, 24 Harv.L.Rev. 415, 429-433 (1911), and cases therein discussed at n. 47.

Additionally, the trial judge's findings preclude recovery on the basis of negligent misrepresentation: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552(1) (1977). We would be hard put to disagree with the trial judge's conclusion that when Godin took Lawton to Meagher's office and thereafter relied on Meagher's actions and statements, Godin exercised reasonable care. See and compare *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 7-9 (1982). Although the matter of the 1973 building code violations was not well handled officially, the blame cannot be placed on Dracousis or Godin.

Our reasons for concluding that Dracousis and Godin are not liable to Lawton in tort for misrepresentation have equal application to Lawton's claim against Godin made under G. L. c. 93A, for alleged violations of 940 Code Mass. Regs. 3.05 and 3.16 (1978), dealing with deceptive statements and nondisclosure.[3] Compare *Homsi* v. *C.H. Babb Co.*, 10 Mass. App. Ct. 474, 478-479 (1980).

4. *Rescission Based on Misrepresentation.*

Rescission of the sale by Lawton for misrepresentations by Dracousis or Godin, or both, fails for the same reasons that the claim for damages does; that is, there were no misrepresentations by either Dracousis or Godin. See and compare *Yorke* v. *Taylor*, 332 Mass. at 371. See also Restatement

---

[3] Section 3.05 provides, in pertinent part: "No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect." The relevant portion of 3.16 states that G. L. c. 93A, § 2, is violated when "[a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction."

(Second) of Contracts § 164(1) (1979). While there is authority for the proposition that a material misrepresentation by one who is not a party to the transaction (Meagher) to one who is (Lawton) may render the contract voidable, we need not consider it. Such relief is unavailable where the other party to the contract (Dracousis) "in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction." Restatement (Second) of Contracts § 164(2), and Comment e (1979).

5. *Rescission Based on Mutual Mistake.*

Although no misrepresentation was made by either Dracousis or Godin, we think that the trial judge's findings require us to mention rescission for mutual mistake. We do so only briefly, because it has been Lawton's position, both at trial and on appeal, that Dracousis and Godin were aware of the outstanding 1973 violations. See Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974). See also *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 748 n.12 (1979), quoting Restatement (Second) of Contracts § 297, Comment c (Tent. Draft No. 10, 1975), now § 155, Comment c (1979). Cf. *O'Donnell* v. *Bane*, 385 Mass. 114, 115-116 (1982).

The purchase and sale agreement between Lawton and Dracousis is silent on the topic of building code violations and thus makes no mention of who would bear the risk of any mistake concerning them. Lawton claims only that had he known the true state of affairs, he would not have purchased the property. Without more, however, it cannot be said that the building code violations had a material effect on the agreed exchange between Lawton and Dracousis. Compare *Dover Pool & Racquet Club, Inc.* v. *Brooking*, 366 Mass. 629, 633 (1975). See Restatement (Second) of Contracts § 152, Comment c (1979). Moreover, it should be remembered that a certificate of inspection was issued to Lawton, albeit erroneously, shortly after he purchased the property. Considering all the circumstances of the controversy, especially the absence of any wrongdoing by either Dracousis or Godin, we see no justification for allocating the risk of the mistake to Dracousis by allowing Lawton to

rescind the sale. See *Covich* v. *Chambers*, 8 Mass. App. Ct. at 751. Compare *Dover Pool & Racquet Club, Inc.* v. *Brooking*, 366 Mass. at 633. See also Restatement (Second) of Contracts § 154(c) (1979). Cf. Restatement of Restitution § 69(1) and (2) (1937).

6. *Dracousis' Counterclaim.*

Lawton's appeal from that part of the judgment which pertains to Dracousis' counterclaim anticipates a rescission of the sale which would thereby relieve him of liability on his second mortgage promissory note. It follows from what we have said that Lawton's liability on that obligation remains undisturbed.

*Judgment affirmed.*