330          62 Mass. App. Ct. 330 (2004)

Shawmut-Canton LLC v. Great Spring Waters of America, Inc.; Kisiel.

SHAWMUT-CANTON LLC *vs.* GREAT SPRING WATERS OF AMERICA, INC.[1]; MARK KISIEL & another,[2] third-party defendants.

No. 03-P-610.

Suffolk. April 9, 2004. - October 22, 2004.

Present: ARMSTRONG, C.J., DREBEN, & COHEN, JJ.

*Real Property,* Lease. *Landlord and Tenant,* Termination of lease, Dependence of obligations. *Fraud. Contract,* Lease of real estate, Cancellation, Misrepresentation, Mistake, Damages. *Mistake. Practice, Civil,* Answer, Amendment. *Damages,* Liquidated damages.

In a civil action arising out of the defendant's attempt to cancel a commercial lease, the judge erred in granting summary judgment in favor of the plaintiff and third-party defendants, where a genuine issue of material fact existed as to whether the plaintiff and the third-party defendants induced the defendant to sign the lease by deliberately misrepresenting the permitted uses of the property in question under local zoning laws [334-336]; on the other hand, there was no error in granting summary judgment to the plaintiff on its claim for rescission on the grounds of mutual mistake and frustration of purpose, where the use of part of the premises as a fleet shop for maintenance of the defendant's vehicles was not the basis for the contract [336-338].

The judge in a civil action arising out of the defendant's attempt to cancel a commercial lease erred in denying the defendant's motion to amend its answer to interpose an affirmative defense of dependent covenants as articulated in *Wesson* v. *Leone Enterprises, Inc.,* 437 Mass. 708 (2002), where the evidence presented by the defendant raised the factual question whether, in the circumstances, it would have been futile for the defendant to give notice to the plaintiff of its default on its duty under the lease to build a fleet shop for maintenance of the defendant's vehicles, in that it was apparent that the local zoning board of appeals would deny permission to build a fleet shop. [338-340]

Statement that if, on the remand of a civil action arising out of the defendant's attempt to cancel a commercial lease, the plaintiff should prevail on the question of liability, the judge should consider whether, in view of an

---

[1]In May, 2002, through a name change, Great Spring Waters of America, Inc., became Nestle Waters North America Inc.

[2]Grubb & Ellis of New England.

ambiguity in the lease, there exists a factual question whether at the time of the execution of the lease, payment of the full rent without an offset for the cost of certain improvements represented a reasonable estimate by the parties of the actual damages in the event that termination were to occur prior to the commencement of the lease. [340-342]

CIVIL ACTION commenced in the Superior Court Department on March 7, 2000.

The case was heard by *Allan van Gestel*, J., on motions for summary judgment, and an emergency motion for leave to file an amended answer was also heard by him.

*Allison W. Phinney, III* (*Michael F. Connolly* with him) for Great Spring Waters of America, Inc.

*Marilyn D. Stempler* for Shawmut-Canton LLC & another.

*Joel G. Beckman* for Grubb & Ellis of New England.

DREBEN, J. As landlord of certain property in Canton, the plaintiff entered into a ten-year lease with the defendant Great Spring Waters of America, Inc. (Great Spring), a company engaged in bottling, distributing, and selling water products. Before occupancy began, Great Spring attempted to cancel the lease because it considered that "an important part of [its] requirements for the property" would not be forthcoming — the town would not grant approval of a proposed fleet shop for the maintenance of Great Spring's many delivery vehicles.

After receiving the attempted cancellation, the plaintiff brought an action for damages in the Superior Court. The defendant set forth numerous defenses, counterclaimed, and asserted third-party claims against Grubb & Ellis of New England (Grubb & Ellis) and Mark Kisiel. The latter had an ownership interest in the property and was president of Grubb & Ellis, a company listed in the lease as one of the two brokers for the property. The judge allowed motions for summary judgment filed by the plaintiff and the third-party defendants and entered judgment for the plaintiff in the amount of $984,098.40. The judgment also places Great Spring under the continuing obligation of paying monthly, until January 31, 2010, the amounts due under the lease less the net proceeds from any reletting of the premises.

Great Spring appeals on numerous grounds, alleging that:

there are genuine issues of material fact relating to its claims of fraudulent inducement, mutual mistake, and the related doctrines of impracticability of performance and frustration of purpose; the judge should have allowed the amendment of its answer to assert the doctrine of dependent covenants articulated in *Wesson* v. *Leone Enterprises, Inc.*, 437 Mass. 708 (2002); and the judge erred as to the award of damages. Because there are issues of material fact concerning fraud, we reverse the judgment in favor of the plaintiff and in favor of the third-party defendants. We also determine that the judge erred in denying the amendment of the answer on the ground that such amendment would be futile.

We state the facts in the light most favorable to Great Spring, the party opposing summary judgment, see *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 393 (2003), reserving additional details for our discussion of the issues raised on appeal. In April, 1999, Great Spring was informed by its broker, William Twomey, that Grubb & Ellis had listed the plaintiff's property in Canton for lease. As Great Spring was at that time seeking a new site for a distribution center and warehouse to serve approximately forty-four delivery routes south of Boston, Diane Petra, the real estate transaction manager of Great Spring, and Twomey met with Kisiel at the property. As previously indicated, Kisiel was the president of Grubb & Ellis as well as an owner of the property. Petra informed Kisiel that Great Spring would, among other things, require for its facility the following: parking for about forty trucks and sixty cars, office space, a fleet shop for the maintenance and repair of the trucks, and a 10,000 gallon above-ground diesel tank for the fueling of the fleet of trucks. She also informed him that every distribution site serving ten or more delivery routes must be equipped with a fleet shop. Although she relied on Twomey to refer her only to properties whose zoning would comply with the needs of Great Spring, she nevertheless specifically requested Kisiel, whom she knew to be an experienced real estate broker, to check Canton's zoning provisions and confirm that there were no zoning or other restrictions that would preclude Great

Spring's intended use of the property.[3] Shortly thereafter, Kisiel telephoned Petra and said that, other than a requirement of a minor reconfiguration of the parking area, there were no restrictions that would interfere with Great Spring's use of the premises as an active distribution center and warehouse. Petra asked Kisiel to confirm this in writing. On April 20, 1999, Kisiel wrote Petra a letter which she understood to be a confirmation of Kisiel's statements that there would be no zoning restrictions on Great Spring's intended use of the property.[4] Petra did not seek additional advice as she was satisfied with Kisiel's representations.

In July, 1999, Great Spring signed the ten-year lease which was later signed on behalf of the plaintiff landlord by "Mark Kisiel, its manager." The lease required the plaintiff to make certain alterations including the building of a fleet shop. Before the plaintiff's work was performed, Great Spring learned that the diesel fuel tank could not be placed where planned because the proposed location was in a ground water protection district, and that the fleet shop could not be built because the property was located in a limited industrial district that specifically prohibited an automotive repair (or fleet) shop. Despite efforts of Kisiel's attorney to obtain permission to construct the fleet shop, the Canton zoning board of appeals (board) denied the application. Although the board had scheduled another hearing on the matter, Kisiel's attorney, by letter, led Great Spring to

[3]The plaintiff argues that Petra's deposition, in which she acknowledged that she relied on Twomey to show her properties that satisfied Great Spring's zoning needs, is inconsistent with her affidavit in which she stated she relied on Kisiel's representations. Whether she relied on Kisiel, as well as Twomey, is a question for the fact finder. See *Kabatchnick* v. *Hanover-Elm Bldg. Corp.*, 331 Mass. 366, 371 (1954); *Yorke* v. *Taylor*, 332 Mass. 368, 373-374 (1955). See also note 6, *infra*.

[4]In relevant part the letter stated:

"We have examined the zoning by laws as well as spoken with a Canton zoning attorney.

"Preliminarily, the stated opinion for providing your required truck and car parking seems very doable. The only issue that could be a problem is encroaching on the required 25' rear yard 'greenbelt' requirement for the construction of the drive in ramp."

334             62 Mass. App. Ct. 330 (2004)

Shawmut-Canton LLC v. Great Spring Waters of America, Inc.; Kisiel.

believe that it was futile to continue with the application. Believing that the board would not allow a fleet shop, Great Spring withdrew its application, attempted to cancel the lease, and this action ensued.

In December, 2001, the judge granted partial summary judgment in favor of the plaintiff and the third-party defendants on the issue of liability. In November, 2002, after the decision in *Wesson* v. *Leone Enterprises, Inc.*, 437 Mass. 708 (2002), Great Spring sought to amend its answer, but the request was denied. In January, 2003, based on the liquidated damages clause in the lease, the judge entered summary judgment for the plaintiff in the amount of $984,098.40.

1. *Fraudulent inducement.* Great Spring claims that there is a genuine issue of material fact as to whether the plaintiff and the third-party defendants induced Great Spring to sign the lease by deliberately misrepresenting the permitted uses of the property under the Canton zoning laws. Great Spring relies on Kisiel's telephone representations to Petra and his letter of April 20, 1999. Great Spring also refers to an exhibit to the lease, which is a plan of the property prepared by the plaintiff's architect showing the proposed location of the diesel tank. On the plan is a small notation — "zoning district: industrial." Had the property been within an industrial, rather than in a limited industrial district, the uses intended by Great Spring would have been permissible.

The judge rejected the claim of fraudulent inducement relying on the following language contained in section 14.13 of the lease:

> "All negotiations, considerations, representations and understandings between Landlord and Tenant are incorporated herein and this Lease expressly supersedes any proposals or other written documents relating hereto. This Lease may be modified or altered only by written agreement . . . ."

Pointing to the sophistication of both parties, the judge viewed the integration clause as intending to eliminate " 'representations' of any and all kinds, *intentional* or negligent" (emphasis supplied). He considered that *Sound*

*Techniques, Inc.* v. *Hoffman,* 50 Mass. App. Ct. 425, 432-434 (2000), supported his view that

> "[s]ophisticated business people, represented by experienced counsel, cannot expect to set forth their agreement in a detailed Lease that, among other things, affirms that the parties are relying upon the document as drafted, and nothing more, and then, when things do not work out as they might like, seek refuge in an argument that there was fraud in the inducement."

In *Sound Techniques* we held that an integration clause barred parol evidence on a claim of negligent misrepresentation.[5] *Ibid.* The rule set forth in *Bates* v. *Southgate,* 308 Mass. 170, 183 (1941), however, remained intact: in cases of fraudulent inducement, relief is not barred by an integration clause, even where the parties are sophisticated and their bargaining powers are equal. See *Sound Techniques, Inc.* v. *Hoffman,* 50 Mass. App. Ct. at 429, 433. See also 11 Williston, Contracts § 33.21, at 671 (4th ed. 1999) ("a merger or integration clause is ineffectual to exclude evidence of prior or contemporaneous extrinsic representations for the purpose of showing fraud or other invalidating cause by way of defense or in an action for rescission").

Turning to the evidence of fraud, we note that although Kisiel's letter of April 20, 1999, does not by itself misrepresent the Canton zoning law requirements, the following questions are raised: whether his prior conversation with Petra together with the letter represented that there were no zoning or other restrictions that could interfere with Great Spring's intended use of the property; if such a representation was made, whether it was material and made with knowledge of its falsity or with reckless disregard of the actual facts, see *Christian* v. *Mooney,* 400 Mass. 753, 764 (1987), cert. denied, 44 U.S. 1053 (1988), and *Macoviak* v. *Chase Home Mort. Corp.,* 40 Mass. App. Ct. 755, 760 (1996); and if the fact finder were to answer those

---

[5]Compare *Marram* v. *Kobrick Offshore Fund, Ltd.,* 442 Mass. 43, 59-61 (2004), distinguishing cases decided on summary judgment or after trial, and holding that, notwithstanding an integration clause, it was error to dismiss a claim for negligent misrepresentation pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974).

336 62 Mass. App. Ct. 330 (2004)

Shawmut-Canton LLC v. Great Spring Waters of America, Inc.; Kisiel.

questions in the affirmative, whether Great Spring was induced by and was reasonable in relying on the misrepresentation to enter into the lease.[6] See *Bates* v. *Southgate*, 308 Mass. at 182; *Commerce Bank & Trust Co.* v. *Hayeck*, 46 Mass. App. Ct. 687, 692 (1999). See also *McGrath* v. *C.T. Sherer Co.*, 291 Mass. 35, 58 (1935); *Yorke* v. *Taylor*, 332 Mass. 368, 373-374 (1955). While the evidence offered by Great Spring on these matters may not be convincing at trial, we think Petra's affidavit is sufficient to withstand a motion for summary judgment on the question of fraud as against the plaintiff, Kisiel, and Grubb & Ellis.[7]

2. *Mutual mistake.* Relying on *Dover Pool & Racquet Club, Inc.* v. *Brooking*, 366 Mass. 629 (1975), Great Spring claims that even in the absence of fraud, the lease is voidable for mutual mistake of fact. The argument is that both parties made the assumption that the Canton zoning law interposed no obstacle to the use of part of the premises as a fleet shop, and that assumption was incorrect as the zoning law specifically excludes an automotive repair shop in the light industrial district.

Great Spring's reliance on *Dover* is misplaced.[8] In that case, the seller was informed, during negotiations, that the intended use of the property by the purchaser was a nonprofit tennis and swim club. Unknown to the parties, four days before the agreement was signed, Medfield, the town through which the only

---

[6]The question of materiality is often joined with the question of inducement. See *National Car Rental Sys., Inc.* v. *Mills Transfer Co.*, 7 Mass. App. Ct. 850, 852 (1979), quoting from *National Shawmut Bank* v. *Johnson*, 317 Mass. 485, 490 (1945) ("A misrepresentation is material if it is shown that the misrepresentation was one of the principal grounds, though not necessarily the sole ground, that caused the plaintiff 'to take the particular action that the wrongdoer intended he should take as a result of such representations and that otherwise he would not have taken such action' "). Cf. Restatement (Second) of Contracts § 162 comment c (1981).

[7]As he was president of Grubb & Ellis, and communicated with Petra using its letterhead, Kisiel's actions raise at least the question of his apparent authority to bind it by his representations.

[8]Noting that the *Dover* case does not mention or deal with an integration clause, the judge ruled that the integration clause of the lease bars Great Spring's claim of mutual mistake. The Restatement (Second) of Contracts takes a contrary view, with which we are in accord. See *id.* at § 214(d) and comment c. See also *id.* at § 152 comment a.

access was established, published notice of a hearing on proposed zoning changes including the requirement of a special permit for a nonprofit tennis club. *Id.* at 630-631. The agreement stated that time was of the essence and the record did not show that the seller was willing to extend the time for closing until after the town meeting considered the zoning amendments. *Id.* at 633. The Supreme Judicial Court permitted rescission, holding that a basic assumption on which the contract was made was that the zoning by-laws posed no impediment to the use of the premises as a nonprofit tennis and swim club. *Ibid.* "[U]se of the only established access to the premises might be barred if no special permit were obtained." *Ibid.* Thus, a right of "vital importance to the purchaser did not exist . . . as a result of the mistake[, and] enforcement . . . would be materially more onerous to the purchaser . . . ." *Ibid.*

Our cases, including *Dover*, "are substantially in accord" with the position of Restatement (Second) of Contracts § 152 (1981), which discusses when a contract is voidable for mutual mistake. *Duclersaint* v. *Federal Natl. Mort. Assn.*, 427 Mass. 809, 813 n.4 (1998). As stated in Restatement (Second) of Contracts, *supra* at § 152 comment c, a party cannot avoid a contract merely because the parties are mistaken as to an assumption, even though significant, on which the contract was made. "Relief is only appropriate in situations where a mistake of both parties has such a material effect on the agreed exchange of performances as to upset the very basis for the contract."[9] *Id.* at § 152 comment a. In *Dover* the only purpose of the purchase — a nonprofit tennis and swim club — was at risk. Similarly in *Jeselsohn* v. *Park Trust Co.*, 241 Mass. 388, 392 (1922), rescission was permitted where a mortgage conveyed a vacant lot when the parties believed it conveyed a lot on which a house had been built. "[W]here there is a mutual mistake between parties as to the subject matter of the contract . . . there is no meeting of the minds . . . ." *Ibid.* See *LaFleur* v. *C.C. Pierce Co.*, 398 Mass. 254, 257-258 (1986); *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 748 (1979). Compare *Lawton* v. *Dracousis*,

---

[9]Of course, rescission is not appropriate if the party seeking relief bears the risk of the mistake. See *Dover Pool & Racquet Club, Inc.* v. *Brooking*, 366 Mass. at 633.

14 Mass. App. Ct. 164, 172 (1982) (building code violations insufficient for rescission).

Here, the lease indicates that the fleet shop was not the subject matter or main focus of the contract. In the first article of the lease, under the heading "Basic Data," is a list of the permitted uses of the premises. They are: "General warehouse and storage facility uses and office uses incidental thereto . . . ." The fleet shop is not mentioned and the only reference to the fleet shop in the entire lease appears in an exhibit setting forth the work the plaintiff agreed to do. Moreover, Great Spring acknowledged in Petra's affidavit that it could "outsource" maintenance of its trucks, albeit at greater cost. While the fleet shop may have been an important inducement to enter into the contract, unlike the nonprofit tennis and swim club in the *Dover* case, it was not "the very basis for the contract."[10] For this reason, particularly in light of the strict test of clear and convincing proof which is required for rescission on the ground of mistake, *Covich* v. *Chambers*, 8 Mass. App. Ct. at 747, summary judgment for the plaintiff on the claim for rescission on the ground of mutual mistake was correct. For analogous reasons, namely that the fleet shop was not Great Spring's principal purpose, judgment for the plaintiff on Great Spring's claim of frustration of purpose was correct. See Restatement (Second) of Contracts, *supra* at § 266(2).

3. *Dependent covenants.* Subsequent to the entry of summary judgment for the plaintiff on liability in December, 2001, the Supreme Judicial Court in September, 2002, decided *Wesson* v. *Leone Enterprises, Inc.*, 437 Mass. 708. The court in that case, *id.* at 720, limited the rule of independent covenants in commercial leases by adopting the following portion of the Restatement (Second) of Property (Landlord and Tenant) § 7.1 (1977):

"Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing,

[10]Restatement (Second) of Contracts, *supra* at § 152 comment c, explains: "It is not enough for [a party] to prove that he would not have made the contract had it not been for the mistake. He must show that the resulting imbalance in the agreed exchange is so severe that he can not fairly be required to carry it out."

something . . . and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may: (1) terminate the lease . . . ."

On October 21, 2002, the judge ruled that the plaintiff was entitled to damages under the liquidated damages clause of the lease, but did not as yet determine the form of the judgment. Great Spring, recognizing that it had a possible additional defense under the *Wesson* case, filed on November 1, 2002, a motion to amend its answer. In its argument in support of the motion, Great Spring claimed that under section 4.2 of the lease the plaintiff had a duty to build a fleet shop, and that the plaintiff had not done so by December 16, 1999, the date on which Great Spring notified the plaintiff it was canceling the lease. Since in its view the fleet shop was a significant inducement to enter into the lease, Great Spring urged it was entitled to rescission.

In denying the motion to amend, the judge relied on section 13.2 of the lease, set forth in the margin,[11] which requires notice by Great Spring to the plaintiff of any default and gives the plaintiff an opportunity to cure, and on section 14.12 of the lease, which requires all notices to be in writing. Noting that Great Spring did not comply with these provisions, and that the doctrine of dependent covenants does not excuse these failures, the judge held that to allow the amendment would be a "futile exercise that would only serve to prolong an already extended piece of litigation . . . ."

Great Spring urges that this ruling is incorrect as the fleet shop could never have been lawfully constructed in the limited industrial district where the property was located no matter how much time the plaintiff had to cure the defect. The plaintiff, on the other hand, points to the fact that a final determination was

---

[11] "Landlord's Default. Landlord shall in no event be in default of the performance of any of Landlord's obligations hereunder (including, without limitation, any obligation to make repairs which Landlord has undertaken hereunder) unless and until Landlord shall have failed to perform such obligations within thirty (30) days, or such additional time as is reasonable [*sic*] required to correct any such default, after notice by Tenant to Landlord specifying wherein Landlord has failed to perform any such obligations."

never made by the Canton zoning board as Great Spring stopped the process before the second hearing, and therefore it cannot be said that the defect was not curable.[12]

Compliance with a notice provision is not required where it would amount to a "useless gesture." *Wolff & Munier, Inc.* v. *Whiting-Turner Contr. Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991), citing *L.K. Comstock & Co.* v. *United Engrs. & Constructors, Inc.*, 880 F.2d 219, 232 (9th Cir. 1989). Cf. *Dunkin' Donuts, Inc.* v. *Gav-Stra Donuts, Inc.*, 139 F. Supp. 2d 147, 154-155 (D. Mass. 2001).

The evidence presented by Great Spring raises the factual question whether in the circumstances giving notice was futile, namely whether it was apparent that the zoning board would deny relief. Accordingly, the motion to amend should not have been denied on this basis.

4. *Damages.* Because we have determined that the judge should not have dismissed some of the defenses or counterclaims of Great Spring, the question of damages may never arise. We nevertheless point to the following language in *Kelly* v. *Marx*, 428 Mass. 877, 880 (1999) (citations omitted):

" 'Where actual damages are difficult to ascertain and

---

[12]The plaintiff also argues that there could be no breach of section 4.2 of the lease (obligating the plaintiff to build the fleet shop) because section 7.2 of the lease required Great Spring to obtain a permit before the plaintiff was obliged to build. Section 7.2 is a section found under the rubric of "Responsibility for Repairs and Condition of Premises." Section 7.1 lists the obligations of the landlord to "keep in good order, condition and repair the roof . . . and structure of the Building . . . ." Section 7.2 sets forth the tenant's obligations — to "keep neat and clean and maintain in good order, condition and repair the Premises and every part thereof, including without limitation the plumbing, electrical and mechanical systems in the Premises, and shall surrender the Premises, at the end of the Term, in such condition. Without limitation, Tenant shall continually during the Term of this Lease maintain the Premises in accordance with all laws, codes and ordinances from time to time in effect, and all directions, rules and regulations of the proper officers of governmental agencies having jurisdiction . . . and shall, at Tenant's own expense, obtain all permits, licenses and the like required by applicable law."

Section 7.2 of the lease is directed to the tenant's maintenance of the property in good condition during the lease term and does not require the tenant to procure a permit for the landlord's initial obligation to build under the lease if there is a problem under the zoning laws.

where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced.' Liquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation."

See also *In re Admetric Biochem, Inc.,* 284 B.R. 1 (Bankr. D. Mass. 2002).

The plaintiff had the obligation under the lease to make improvements that were never performed due to the zoning restrictions. The rent was calculated to amortize those improvements. Kisiel estimated the cost of these improvements at $450,000 to $500,000; Great Spring estimated their cost at $725,000 to $750,000.

Although the judge found that the first sentence of the liquidated damages clause of the lease, section 13.1(c), set out in its entirety in the margin,[18] was ambiguous, he construed the section to apply without an offset for the cost of the improvements. He reached his conclusion based on *Kelly* v. *Marx,* 428 Mass. at 878, on the ground that a judge should examine only the circumstances at the time of contract formation and not take a "second look."

The first sentence of section 13.1(c) of the lease speaks of sums payable up to the time of termination; here, as the judge noted, there were no sums payable at that time as the termination occurred before the commencement date. If, on remand, the

[18]Section 13.1(c) of the lease provides: "If this lease shall be terminated as provided in this article, Tenant shall pay the Basic Rent and other sums payable hereunder up to the time of such termination, and thereafter Tenant, until the end of what would have been the Term of this Lease in the absence of such termination, and whether or not the Premises shall have been relet, shall be liable to the Landlord for, and shall pay to the Landlord, as liquidated current damages, the Basic Rent and other sums which would be payable hereunder if such termination had not occurred, less the net proceeds, if any, of any reletting of the Premises, after deducting all expenses in connection with such reletting, including, without limitation, all repossession costs, brokerage commissions, legal expenses, attorneys' fees, advertising costs, expenses of employees, alteration costs and expenses of preparation for such reletting. Tenant shall pay such current damages to Landlord monthly on the days which the Basic Rent would have been payable hereunder if this Lease had not been terminated."

plaintiff prevails on the question of liability, the judge should consider whether, in view of the ambiguity, there exists a factual question whether at the time of the execution of the lease, payment of the full rent without an offset for the cost of the improvements represented a reasonable estimate by the parties of the actual damages in the event that termination were to occur prior to the commencement of the lease.

We do not consider any other question as to damages.

*Conclusion.* The judgment in favor of the plaintiff and the third-party defendants is reversed and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*