MAURICE G. ALPERIN, trustee,[1] & others[2] *vs.* EASTERN
SMELTING AND REFINING CORPORATION.[3]

No. 91-P-462.

Essex. November 13, 1991. - May 22, 1992.

Present: WARNER, C.J., KASS, PERRETTA, FINE, & GILLERMAN, JJ.

*Contract*, Performance and breach, Sale of securities, Implied covenant of
good faith and fair dealing. *Accountant. Value. Appraisal. Sale*, Of
stock. *Corporation*, Close corporation. *Practice, Civil*, Findings by
judge. *Damages*, Breach of contract, Interest.

A closely held corporation was liable for breach of a stock purchase con-
tract (as well as the contract's implied covenant of good faith and fair
dealing) under which the corporation was to purchase its own stock
from three shareholders at a price to be determined by an independent
auditor according to a pricing formula embodied in the contract, where
the judge at the trial of the shareholders' claims against the corporation
was warranted in finding that the corporation had caused the auditor to
adjust the purchase price in its favor, in various respects which de-
parted from the agreed-upon formula; that the shareholders did not
know of these adjustments at the time of a meeting that established the
final price; and that the auditor's statement of the final price did not
have the same binding effect as an arbitral award for which the con-
tract made provision. [545-550] GILLERMAN, J., concurring and dissent-
ing in part. FINE, J., dissenting.

A party in breach of a contract for the purchase and sale of stock was not
a "defaulting party" within the meaning of the contract's provisions
requiring payment of interest, costs, and attorney's fees. [550]

[1]Of the Maurice G. Alperin Revocable Trust.

[2]Nancy Medlinsky and Barbara Nöymer, daughters of Maurice G.
Alperin.

[3]This case was initially heard by a panel comprised of Justices Perretta,
Fine, and Gillerman and was thereafter submitted on the record and briefs
to Chief Justice Warner and Justice Kass, who took part in the decision of
this case in accordance with the provisions of Mass.R.A.P. 24(a), 365
Mass. 872 (1974).

CIVIL ACTION commenced in the Superior Court Department on December 30, 1987.

The case was heard by *Peter F. Brady*, J.

*Edward J. Barshak* (*Barbara L. Siegel* with him) for the defendant.

*Walter A. Costello, Jr.* (*Julie M. Conway* with him) for the plaintiffs.

PERRETTA, J. In 1984, Maurice Alperin (Maurice) entered into a contract with Eastern Smelting and Refining Corporation (Eastern), whereby Eastern agreed to repurchase, for full value, shares of its stock from the plaintiffs. Under the terms of the agreement, the value of the stock was to be determined by an independent auditor in accordance with a pricing formula which was part of the contract. Three years after the purchase was completed, the plaintiffs brought this action alleging that they had not been paid the full value of their shares. They claimed that Eastern had caused the auditor to deviate from the pricing formula. Eastern answered that the plaintiffs had accepted the auditor's statement of final price and that the statement was, under the contract, final and binding as an arbitrator's award. A Superior Court judge found and concluded that, because there had been no arbitration, the statement was not binding upon the plaintiffs and that Eastern had violated the contract and its implied covenant of good faith and fair dealing. He awarded the plaintiffs damages and treated Eastern as a defaulting party subject to the contract's provisions for the payment of interest, costs, and counsel fees. On appeal, Eastern argues that the trial judge was in error in failing to give conclusive effect to the auditor's statement of final price and in concluding that Eastern was a defaulting party. We agree that Eastern is liable for damages for its breach but conclude that it is not subject to the contract's provisions for interest and fees as a defaulting party within the meaning of the contract terms. The judgment, therefore, must be corrected and, as corrected, is affirmed.[4]

---

[4]The trial judge dismissed count II of the plaintiffs' complaint, which stated a claim under G. L. c. 93A, on the basis that the transaction be-

1. *The evidence.* Eastern is a Massachusetts corporation engaged in the business of extracting, refining, and selling precious metals. It is a family corporation, having been founded by Maurice's father in 1932. For many years Maurice and his brother, Jordan Alperin (Jordan), were officers of the corporation. Maurice handled sales and financial matters while Jordan saw to the operation of the plant.

In 1974, Maurice and Jordan, who were then in their sixties, entered into a stock purchase agreement. Under this agreement, there was to be a buyout of the shares of whichever of them should die first. The purchase price was to be determined in accordance with a formula set out in section 3 of the agreement. Section 4 provided that the payout of the determined price was to be made to the estate of the deceased brother over a one-year period.

In 1983, Maurice began to explore the possibility of a sale of the plaintiffs' shares to Eastern.[5] He discussed this possibility with John Conroy (Conroy), a partner with Peat Marwick, Mitchell & Co. (Peat). Conroy had done work for Eastern, as well as for Maurice personally, since 1969, and Maurice trusted him. After numerous meetings and negotiations, Maurice, Jordan, and Eastern, by its president John Friberg (Friberg), entered into the agreement of January 16, 1984.[6]

By this agreement Eastern was to purchase all its stock owned by the plaintiffs at an aggregate purchase price to be determined as of December 31, 1983, by Eastern's independent auditor, Peat, in accordance with § 3 of the earlier stock purchase agreement. The pricing formula called for the valuation of inventory (precious metals) at fair market value, as determined by Peat. All other assets were to be assigned

tween the parties is "principally private in nature." See *Riseman* v. *Orion Research Inc.*, 394 Mass. 311, 313-314 (1985); *Zimmerman* v. *Bogoff*, 402 Mass. 650, 662 (1988). We agree.

[5]Maurice, as trustee, owned thirty-seven percent of Eastern's outstanding capital stock, and his two daughters each owned six and one-half percent. Jordan owned the remaining fifty percent.

[6]The parties stipulated that Maurice acted for the trust and his two daughters at all times.

book value by Peat, using generally accepted accounting principles. Liabilities, including provision for taxes, were to be subtracted from the total value of the assets, to which would be added, as good will, five percent of the excess of assets over liabilities.

As further provided in the contract, one-half of the total net value, or stockholders' equity, was to be paid to the plaintiffs in the following manner. Eastern was to pay the plaintiffs, against delivery of all the stock to be sold, the sum of $10,855,500, as an "initial estimate" of the final purchase price. Out of that sum, Maurice was required to deposit $250,000 into an escrow account to secure certain contingencies. No later than eight months thereafter, Peat was to complete its audit of Eastern's books and records and "prepare a certified statement of the [final] purchase price" in accordance with the pricing formula. If the final price was less than the initial estimate, the plaintiffs had five business days in which to return the difference to Eastern, which was under a like obligation in respect to any deficit. A failure to make this payment constituted a default, and the defaulting party would be liable for interest on the amount owed and the costs of collection, including counsel fees.

On July 18, 1984, six months after the closing and payment of the initial estimate, Maurice, Conroy, Friberg, and Kenneth Rosenberg (Rosenberg), Eastern's executive vice president, attended a meeting at which Conroy gave Maurice written notice of the final price. The notice, in letter form on Peat's stationery, advised that the final price was $10,604,279. Maurice asked Conroy, "Is this correct?" When Conroy answered that it was, Maurice excused himself from the meeting, went to the bank, and returned with a check for the required amount, $251,221, payable to Eastern. Friberg and Rosenberg acknowledged receipt of the check "as final settlement" across the bottom of the notice that had been given to Maurice.

Three years later, on August 6, 1987, Maurice and Conroy became involved in a disagreement concerning disbursement of the money Maurice had been required to deposit in

the escrow account at the time of the January 16, 1984, closing to secure contingencies. They exchanged words, and Maurice demanded to be given a breakdown of the adjustments made by Peat in calculating the final price for the stock. Conroy gave Maurice a sheet of figures showing the adjustments.

These figures showed that Peat had not adhered to the contract pricing formula in determining the full value of the stock. Peat had made adjustments to the initial price which were attributable to (1) fifty percent of the after-tax cost to Eastern for accounting and legal services;[7] (2) an allocation of interest charges incurred and revenue lost by Eastern as a result of making the up-front cash payment; and (3) an interest adjustment on Eastern's hedging transactions.[8] Although these adjustments were for items not contemplated by the pricing formula, with the exception of the hedging transactions, they had been requested by Eastern.

Friberg and Rosenberg, even though they knew prior to January 6, 1984, that Eastern would have to secure a loan for the amount of the initial payment to be made upon the signing of the contract on January 16, believed the adjustments were fair and equitable. They discussed the adjustments with Conroy and Anthony Pietraffita (of Peat). Peat, with some modifications, accepted and made the adjustments. Neither Friberg nor Rosenberg told Maurice about the requested adjustments, and they did not know whether Conroy did.

According to Conroy's testimony, Maurice knew about and accepted the adjustments. He stated that he had discussed the adjustments with Maurice in 1984, in general terms on June 6 and 27, and in specific figures on July 13

---

[7]Eastern's attorney drafted the contract.

[8]These adjustments were in the amounts of $12,250 (accounting and legal services), $35,804 (interest expense on a demand loan), $266,908 (interest revenue lost), and $62,326 (hedging transactions). Section 3 of the 1974 stock purchase agreement includes the requirement of "giving effect to [Eastern's] hedging transaction and selling practices." An exhibit prepared by Peat explains that the hedging item resulted from the pricing formula. We agree.

and July 18, and that Maurice did not dispute them until their disagreement in 1987. Maurice testified that he did not know about the adjustments. He accepted Peat's statement of the final price on July 18, 1984, and immediately paid the difference because he had agreed to be bound by Peat's determination and did not want to incur any interest on the amount due from him.

2. *The findings.* Although perhaps wanting in some details, the trial judge's findings of fact and conclusions of law satisfy the purposes of Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). See *Bruno* v. *Bruno*, 384 Mass. 31, 36 n.7 (1981), citing *Cormier* v. *Carty*, 381 Mass. 234, 236 (1980); *Schrottman* v. *Barnicle*, 386 Mass. 627, 638-639 (1982). He found that, during the negotiations and meetings which led to the 1984 contract, Maurice "emphasized his desire to receive payment up front on the date of the closing and not in installments," as had been provided for in the 1974 stock purchase agreement. He further found that Friberg and Rosenberg knew of the payment provision in the 1984 contract and that Eastern would have to secure a loan for the initial payment in order to purchase the plaintiffs' shares on the closing date of January 16, 1984.

We think it implicit in the trial judge's express findings that he (having heard the evidence and being in the best position to determine credibility, see *Simon* v. *Weymouth Agric. & Indus. Soc.*, 389 Mass. 146, 148 [1983]) did not accept Conroy's testimony concerning his numerous discussions with Maurice about the nature and amounts of the adjustments. Had the trial judge accepted that testimony, his conclusions of law show that this dispute would have ended there and in Eastern's favor. Instead, the trial judge went on and found that there had been no arbitration, as permitted by the contract, concerning the propriety of the adjustments and that "[o]n August 6, 1987, the plaintiffs received a breakdown of the adjustments [from Conroy] upon which the final purchase price was determined."

Consistent with these findings, the trial judge concluded that the adjustments "were unauthorized and directly con-

trary to the parties' January 16, 1984 [a]greement, thereby breaching the contract and the contract's implied covenant of good faith and fair dealing." He entered judgment for the plaintiffs in the sum of $377,288 (that which the plaintiffs paid Eastern, $251,221, plus $126,067, which Eastern should have paid the plaintiffs), with interest as of July 18, 1984, at the rate set out in the contract, in the amount of $321,563.08, and attorneys fees and costs in the sum of $35,001.05.

3. *Eastern's breach.* It is Eastern's argument that Peat's statement of the final price, given to Maurice on July 18, 1984, was final and binding on the parties under the terms of the contract. Eastern points to paragraph 9 of the contract and undisputed portions of the evidence as support for this claim.

We set out the pertinent portion of paragraph 9. "Without limiting the generality of any other provision of this . . . agreement, it is expressly agreed that all questions of intepretation and disputes hereunder and under Section 3 of the Stock Purchase Agreement . . . are to be finally resolved by . . . [Peat] acting as an expert and as an arbitrator and that a certificate from . . . [Peat] as to the intended meaning or application or effect of any provision hereof or thereof shall be conclusive and binding evidence of such meaning, application or effect. Any certificate from . . . [Peat] pursuant hereto shall be and given effect as a final arbitral award made pursuant to an agreement for binding arbitration and may be enforced by any party hereto as such a final arbitral award."

Eastern attaches significance to the undisputed facts that Friberg and Rosenberg discussed the adjustments with Conroy and Pietraffita, who modified the figures in order to treat Maurice and Jordan fairly and equitably. Eastern believes that these facts establish that, all in accordance with paragraph 9, Eastern went to Peat with its belief that the adjustments were fair and equitable and that Peat considered the requests and decided that they should be allowed with modifications. Peat's ensuing statement of final price was, there-

fore, a certificate having a conclusive effect upon the parties. Eastern also argues that Maurice was aware of the finality of Peat's determination, as can be seen from his testimony explaining why, on July 18, 1984, he made the payment without question: "I had an agreement with my brother that I would honor whatever Peat . . . determined at the end of the six-month period; that is, in July. And, all I did was honor it. And, I honored it quickly, because I didn't want to become subject to interest charges."

This argument is contradicted by the clear language of both Peat's statement of final price and the various provisions of the contract. The letter setting out Peat's statement of final price does not purport to be a certificate under paragraph 9 of the agreement. Rather, it is expressly characterized as a statement of final price given "[p]ursuant to paragraph 4" of the contract. Paragraph 4 requires Peat to prepare a statement of final price upon completion of its audit of Eastern's books and records. Presentation or service of the statement started the running of the five-day period for the payment of any difference between the initial and final price. Consistent with the purpose of paragraph 4, the statement advised Maurice that he owed Eastern $251,221.

Moreover, the letter presented under paragraph 4 opens with the recital that, "[p]ursuant to paragraph 1 of the agreement . . . the final purchase price for the stock is $10,604,279." The penultimate sentence informed Maurice that he had five days in which to pay the difference between that amount and the initial overpayment of $10,855,500. The letter is silent in all respects as to paragraph 9 of the agreement.

We think it apparent from the letter and the testimony of its author, Conroy, who stated that there was no arbitration because there never was a dispute, that the letter was the required product of Peat's audit procedures and not a final and binding decision of Peat resulting from arbitration proceedings.[9] Arbitration is a procedure whereby disputes are

---

[9]Paragraph 4 does make reference to a "certificate." However, that reference is to the "certificate . . . delivered by . . . [Peat] pursuant to Sec-

resolved after a hearing, unless the parties expressly other-
wise agree. See G. L. c. 251, § 5.[10] Maurice was given no
opportunity to be heard or to present his views; he could not
question or dispute something about which he had no knowl-
edge, as the trial judge found. It does not follow from the
fact that Peat heard, considered, and modified Eastern's re-
quests that its decision to make the adjustments had the final
and binding effect of an arbitral award under paragraph 9 of
the agreement. See *Shurtleff* v. *Parker*, 138 Mass. 86, 87
(1884).

Eastern also argues that Peat's statement of final price is
binding because the parties intended that Peat was to have
unlimited authority in determining the purchase price of the
stock. This intent can be found, Eastern claims, in para-
graph 4's provision pertaining to the payment of any excess
or deficit determined by Peat to exist between the initial and
the final price: "In the event that the Final Price as deter-
mined by . . . [Peat] differs from the . . . initial estimated
payment *for any reason whatsoever*, the difference shall be
adjusted . . ." (emphasis added). Eastern construes para-
graph 4 of the agreement as granting plenary power to Peat,
that is, authorization to adjust the estimated purchase price
"for any reason whatsoever."

Eastern's reading of that particular phrase would permit
Peat to deviate from, even to nullify, the pricing formula
which the parties expressly and repeatedly agreed would ap-
ply. However, it can be seen from the contract in its entirety,
including paragraph 4 itself, that Peat was not authorized to
go outside the formula in calculating the final price. By para-
graph 1 of the contract, the parties "agree[d] to adhere to

---

tion 3(e)" of the 1974 agreement and not paragraph 9 of the 1984 con-
tract. This is made clear by section 3(e), which requires Peat to "prepare a
certified statement of the purchase price . . . in accordance with the provi-
sions of paragraphs (a) through (d) . . . ," the formula. Pargraph 4,
therefore, in referring to a "certificate," is speaking to a certified state-
ment of the final purchase price and not to a certificate of decision after
arbitration proceedings under paragraph 9.

[10]The contract requires that it "be construed in accordance with the
laws of the Commonwealth of Massachusetts."

and be bound in all respects by the provisions of Section 3 of the Stock Purchase Agreement [the formula]." Section 3(e) calls for Peat to "prepare a certified statement of the purchase price of the stock in accordance with the provisions of paragraphs (a) through (d) of this Section . . . ." The process is completed with paragraph 4's requirement that Peat deliver the certificate of the final price "pursuant to Section 3(e) of the Stock Purchase Agreement."

The clear language of the agreement shows that the parties did not intend to be bound by Peat's decision regardless of how it was reached. See *Cambridge St. Metal Co.* v. *Corrao*, 30 Mass. App. Ct. 150, 156 (1991). The contract did not authorize Peat to determine the final purchase price on any basis it saw fit. Rather, the parties expressly agreed that Peat had the authority to make adjustments "for any reason whatsoever," but only within the pricing formula. Put another way, the phrase relied upon by Eastern is a reasonable acknowledgment by the parties that the required application of the pricing formula could result in a larger or smaller final purchase price for any one or more reasons having to do with generally accepted accounting procedures. See *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990). See also *Cambridge St. Metal Co.* v. *Corrao*, 30 Mass. App. Co. at 155. Eastern does not contest that Peat, in making the adjustments in issue, did not follow the pricing formula. The result is that Peat's statement of final price is not entitled to the finality intended by the contract. *Id.* at 154-156.

Eastern suggests on appeal that Maurice, by accepting Peat's statement of final price without question, waived any rights which he might have had or that he somehow demonstrated that he was agreeing that Peat's decision, no matter how made, was to be binding on him. We conclude that any argument along these lines is not open to Eastern for the following reasons. The trial judge found that "[t]here was no modification of the January 16, 1984 Agreement." Maurice's undisputed testimony, that he did not question the final price because he had agreed to be bound by what Peat determined, does not show the finding to be clearly erroneous. That testi-

mony, construed reasonably in the context in which it was given as well as consistently with the trial judge's other findings, shows that Maurice was speaking in terms of the price as arrived at by application of the formula as set out in the agreement. He did not choose to question adjustments made *within* the formula because he had agreed that Peat's word would be final on the application of that formula. Additionally, Eastern did not raise at trial any claim of estoppel or waiver by payment. Its theory of defense was that Conroy had told Maurice about the adjustments, and Maurice did not dispute them. Its claims on appeal are limited to the trial judge's rulings and conclusions of law, and it has not argued that the trial judge's findings lack support in the evidence. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 n.25 (1991). Cf. *National Med. Care, Inc.* v. *Zigelbaum*, 18 Mass. App. Ct. 570, 579 (1984); *Messina* v. *Scheft*, 20 Mass. App. Ct. 945, 946 (1985); *Harrington-McGill* v. *Old Mother Hubbard Dog Food Co.*, 22 Mass. App. Ct. 966, 968 (1986), and authorities therein cited.

We also note that Eastern has offered no real explanation as to why Maurice should be under the duty or obligation to inquire, rather than to rely upon his contract and expect that Eastern would do the same, while Eastern should be relieved of its obligation either to adhere to the formula, as it expressly agreed to do, or to advise or to disclose to Maurice the fact that it wished to seek adjustments outside the formula from Peat. Cf. *Moulton* v. *McOwen*, 103 Mass. 587, 597-598 (1870); *Sher* v. *Sandler*, 325 Mass. 348, 354-355 (1950); *Gishen* v. *Dura Corp.*, 362 Mass. 177, 184-185 (1972).

Based upon the unambiguous terms of the contract and the trial judge's findings (that Eastern knew, prior to signing the agreement, that it would have the expenses for which it later sought adjustments, that it knew that these expenses were not included in the pricing formula by which it had agreed to be bound, that it nonetheless thereafter sought adjustments for those expenses, that there was never any arbitration, and that Maurice did not know that those adjust-

ments had been sought and made), we see no error in his ultimate conclusion that Eastern had violated the contract and its implied covenant of good faith. See *Gishen* v. *Dura Corp.*, 362 Mass. at 184; *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976), quoting from *Uproar Co.* v. *National Bdcst. Co.*, 81 F.2d 373, 377 (1st Cir.), cert. denied, 298 U.S. 670 (1936); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 471-473.

4. *Interest and counsel fees.* Having concluded that Eastern was in breach of the contract by reason of its failure to pay the plaintiffs the full value of their stock, the trial judge assessed interest and attorney's fees against Eastern as a defaulting party under paragraph 4 of the agreement. It appears that the trial judge concluded that Eastern was a defaulting party because it knew that it was paying less than what would have been due had the adjustments not been made. Eastern argues that the present action is not based upon its failure to pay the final price determined by Peat and that paragraph 4 is limited to that type of failure or default.

By its very terms, that paragraph speaks to an award of interest and counsel fees only where there has been a default in the payment of any difference between the initial and the final price, as set out in Peat's postaudit statement. This limitation is evidenced by the provision that the "defaulting party shall be liable for all costs of *collection*, including reasonable attorney fees" (emphasis supplied). Although Eastern was in breach of the contract on July 16, 1984, it was not in default within the meaning of paragraph 4. See, e.g., *Zaltman* v. *Forbes*, 2 Mass. App. Ct. 607, 612-613 (1974). Reading the agreement in its entirety and with an eye to the purpose and context in which the parties entered into the contract, we conclude that the trial judge was in error, as matter of law, in applying that provision to this action seeking damages for breach of contract.

We do not, however, see any error in the trial judge's conclusion that the plaintiffs were entitled to interest as of July 18, 1984. Although Eastern's breach appears to have begun earlier, it was completed no later than that date. The

plaintiffs, therefore, are entitled to interest on their damages under G. L. c. 231, § 6C. See *Sterilite Corp.* v. *Continental Cas. Co.*, 397 Mass. 837, 841 (1986), quoting from *Perkins Sch. for the Blind* v. *Rate Setting Commn.*, 383 Mass. 825, 835 (1981).

5. *Conclusion.* Eastern's final argument, that the trial judge abused his discretion in admitting portions of a deposition in evidence, requires no discussion. The judgment is affirmed on count II of the complaint and vacated on count I. A new judgment is to be entered on count I for damages in the amount of $314,962,[11] with interest thereon pursuant to G. L. c. 231, § 6C. Attorney's fees are not to be awarded.

*So ordered.*

GILLERMAN, J. (concurring in part and dissenting in part). I agree that Maurice is entitled to the unpaid balance of the contract purchase price, after deducting the adjustment for the hedging transactions. See *Cambridge St. Metal Co.* v. *Corrao*, 30 Mass. App. Ct. 150, 155-156 (1991). I do not, however, join in the statement of the majority that Eastern "violated the contract and its implied covenant of good faith." Quite the contrary, Eastern did precisely what Peat — the accountant whom both parties selected to do the job of calculating the final adjustments — finally determined ought to be done, and in my view that is performance in good faith. It is for this reason that I am unable to agree that interest on the balance due Maurice should begin to run any earlier than the date of the commencement of the suit.

FINE, J. (dissenting). I view the stock purchase agreement and the transaction which took place on July 18, 1984, differently from the way in which the majority views them. In my view, Conroy's letter on Peat stationery setting forth the

---

[11]This amount takes into account the hedging adjustment permitted by the formula. See note 8, *supra.*

final price, whether so labelled or not, constituted the "certificate" which, according to the contract, was to be "given effect as a final arbitral award . . . ." Also, I think the contract, and in particular the reference to price adjustments "for any reason whatsoever," afforded greater flexibility in the formula for determining the purchase price.

Even assuming the majority's conclusions on those points to be correct, however, I part company with them on the consequences flowing from the July 18, 1984, meeting among Maurice, Conroy, and, representing the defendant corporation, John Friberg and Kenneth Rosenberg. Based upon what transpired at that meeting, the conclusion is inescapable that all parties accepted Conroy's letter as the "certificate" which was to be "given effect as a final arbitral award."

At the meeting, Conroy presented the letter stating the final price of $10,604,279, and the $251,221 payment to the corporation required of Maurice as a final adjustment. The judge found that Friberg and Rosenberg, acting on behalf of the defendant corporation, thought the adjustments they had suggested to Conroy to be fair and reasonable, that Conroy reviewed the suggested adjustments and made some minor changes in the calculations in Maurice's favor, and that another Peat partner reviewed the calculations and reported to Conroy that the figures were correct. Maurice's testimony, by which he is bound, was that he did not at the time of the July 18 meeting ask for a breakdown of the adjustments. Instead, he simply asked Conroy, whom he trusted, whether the amount stated was correct, and Conroy answered affirmatively. (Conroy had provided personal accounting services to Maurice both long before and long after the meeting.) Maurice then obtained a check in the specified amount and handed it to Rosenberg and Friberg. Both of them then signed a handwritten receipt at the bottom of Conroy's letter stating that the check was received "in final settlement." The letter, so annotated, was then given back to Maurice. It wasn't until three years later, after an unrelated dispute arose between Maurice and Conroy, that Maurice first asked for and received a breakdown of the price adjustments and

commenced this action against the corporation for breach of contract.

The majority affords relief to Maurice, notwithstanding the use of the term "final settlement" and the absence of any fraud or bad faith on the part of the defendant, presumably on the theory that he accepted the adjustments and made the payment as the result of a mistake. The factual mistake on Maurice's part, if any, was as to the basis for the adjustments to the final price. Only Maurice among the parties present at the July 18 meeting was unaware of the basis for the adjustments. Any mistake, therefore, was unilateral. "There are limited circumstances in which a party may avoid a contract on the basis of a unilateral mistake: 'if he does not bear the risk of mistake . . ., and (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake.' Restatement (Second) of Contracts § 153 (1979). See *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 749-750 & n.13 (1979)." *First Safety Fund Natl. Bank* v. *Friel*, 23 Mass. App. Ct. 583, 588 (1987).

In the circumstances, any unilateral mistake on Maurice's part should not afford him the right to recover. Having been responsible for the corporation's sales and financial affairs, and having sold his share in the business for over $10,000,000, he must be regarded as a sophisticated businessman. He had every opportunity at the meeting to ask for a breakdown of the adjustments. He chose to rely on Conroy, however, for several obvious reasons. Their past relationship was one of trust and confidence. The amount Maurice was being asked to pay was a small percentage of the over-all purchase price, and the payment would benefit Maurice's brother, the owner of the remaining fifty percent of the shares in the defendant corporation. The contract language was not entirely clear as to the right to adjustments for costs of the transaction. Conroy was a partner in Peat, and the parties had agreed in the contract that Peat's expert appraisal would ultimately establish the price. Had Maurice

obtained the breakdown at the meeting and differed with it, his only remedy under the contract would have been to press his interpretation in arbitration before Peat.

Unquestionably, Maurice made a conscious decision to treat his limited knowledge as sufficient and to forgo the only alternative he then had to accepting the adjustments, namely, to assert his right to dispute the adjustments in arbitration before Peat. Maurice's own actions required him to bear the risk of any mistake. See *Covich* v. *Chambers*, 8 Mass. App. Ct. at 751; Restatement (Second) of Contracts § 154, comment c, and § 296. Compare *Rosenfeld* v. *Boston Mut. Life Ins. Co.*, 222 Mass. 284, 290 (1915). Moreover, any mistake on his part about whether the $251,550 payment was called for hardly made it "unconscionable" for him not to have the funds restored. Nothing the officers of the defendant corporation did before the payment was made prevented Maurice from learning the basis for the adjustments. In these circumstances, particularly in light of the length of time that had elapsed after the meeting on July 18, 1984, before Maurice made any claim, he should be deemed to have accepted Conroy's letter as the "certificate" and be barred from recovering his claimed overpayment.