In re ADMETRIC BIOCHEM,
INC., Debtor.

Cummings Properties, LLC, Plaintiff,

Kathleen Dwyer, Chapter 7 Trustee
of Admetric Biochem, Inc.,
Defendant.

Bankruptcy No. 01–18351–JNF.
Adversary No. 02–1012.

United States Bankruptcy Court,
D. Massachusetts.

Sept. 30, 2002.

**2**

David R. Suny, Cummings Properties, LLC, Woburn, MA, for plaintiff.

Kathleen P. Dwyer, Jeffrey B. Loeb, Ardiff & Morse, P.C., Danvers, MA, for defendant.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matters before the Court are Cross–Motions for Summary Judgment filed by Cummings Properties, LLC ("Cummings") and Kathleen Dwyer, the Chapter 7 Trustee (the "Trustee") of Admetric Biochem, Inc. ("Admetric" or the "Debtor"). The issue presented is whether a lease acceleration clause in the lease between Cummings and Admetric is an enforceable liquidated damages provision and a proper component of Cummings' proof of claim. Cummings argues that it should be allowed a breach of lease claim to the extent permitted by 11 U.S.C.

§ 502(b)(6), notwithstanding the subsequent lease of the premises formerly occupied by Admetric. The Trustee disagrees, arguing that the rent acceleration clause is unenforceable because the damages thereunder are "grossly disproportionate to a reasonable estimate of actual damages made at the time of contract formation," see Kelly v. Marx, 428 Mass. 877, 880, 705 N.E.2d 1114 (1999), and contrary to public policy.

The Court heard the Cross–Motions on September 3, 2002. The material facts necessary to decide the issue are not in dispute. Accordingly, the matter is ripe for summary judgment. For the reasons set forth below, the Court grants the Trustee's Motion for Summary Judgment and denies Cummings' Motion for Summary Judgment.

### II. FACTS

On August 25, 2000, approximately 14 months before it filed a voluntary Chapter 7 petition, Admetric executed a commercial lease with Cummings for premises totaling approximately 12,000 square feet located at 200 Boston Avenue, Medford, Massachusetts. The lease was for a five-year term, beginning on October 1, 2000, with annual rent of $437,691 or $36,474.25 per month due under its terms. In conjunction with the execution of the lease, Cummings obtained a cash security deposit in the sum of $73,000 and was named as a beneficiary of a letter of credit in an equal amount.

In an Affidavit, the Operations Manager of Cummings, Stephen J. Drohosky ("Drohosky"), indicated that in the month before Cummings executed its lease with Admetric, it had over seven million square feet of commercial property under management, of which approximately 715,000 square feet, or approximately 10%, was vacant or scheduled to become vacant be-

fore September 30, 2000. He added that much of that vacant space was laboratory space, or suitable for conversion to laboratory space, and the vacant space included 12,000 square feet of space at 200 Boston Avenue in Medford, Massachusetts. Based upon Cummings' vacancy rates, Drohosky stated that it was difficult to estimate Cummings' damages in the event of breach by Admetric because it was impossible to predict when a breach by Admetric might occur and how much of the total rent owed for the entire lease term would remain unpaid.

David R. Suny ("Suny"), Associate Counsel for Cummings, as well as Drohosky, indicated that Cummings and Admetric negotiated and agreed to numerous changes to Cummings' standard form lease agreement, adding 15 additional provisions to the lease. Suny attached to his Affidavit comments about the lease terms made by J. Flory McCarthy of Spaulding & Slye/Colliers International, a real estate brokerage firm representing Admetric, and delivered to Admetric's attorney at Hale & Dorr, Keith Barnett, Esq.

The pertinent lease provisions are Sections 2 and 20 and Paragraph K to the Rider to Lease, which was negotiated by the parties. These provisions provide the following:

> 2. **SECURITY DEPOSIT.** LESSEE shall pay to LESSOR a security deposit in the amount of one hundred forty six thousand (146,000) U.S. dollars upon the execution of this lease by LESSEE, which shall be held as security for LESSEE's performance as herein provided and refunded to LESSEE without interest at the end of this lease, subject to LESSEE's satisfactory compliance with the conditions hereof. LESSEE may not apply the security deposit to any payment due under the lease. In the event of any default or breach of this lease by LESSEE, however, LESSOR may elect to apply the security deposit first to any unamortized improvements completed for LESSEE's occupancy, then to offset any outstanding invoice or other payment due to LESSOR, and then to outstanding rent. If all or any portion of the security deposit is applied to cure a default or breach during the term of the lease, LESSEE shall restore said deposit forthwith. LESSEE's failure to remit the full security deposit or any portion thereof or to restore said deposit when due shall constitute a substantial lease default. . . .

> \*   \*   \*   \*   \*   \*

> 20. **DEFAULT AND ACCELERATION OF RENT.** In the event that: (a) any assignment for the benefit of creditors, trust mortgage, receivership or other insolvency proceeding shall be made or instituted with respect to LESSEE or LESSEE's property; (b) LESSEE shall default in the observance or performance of any of LESSEE's covenants, agreements, or obligations hereunder, and such default shall not be corrected within 30 days after written notice thereof; or (c) LESSEE vacates the leased premises without continuing to pay rent, then LESSOR shall have the right thereafter, while such default continues and without demand or further notice, to re-enter and take possession of the leased premises, to declare the term of this lease ended, and to remove LESSEE's effects, without being guilty of any manner of trespass or conversion, and without prejudice to any remedies which might be otherwise used for arrears of rent or other default or breach of the lease. If LESSEE shall default in the payment of the security deposit, rent, taxes, or substantial invoice from LESSOR or LESSOR's agent for goods and/or services or other

sum herein specified, and such default shall continue for 10 days after written notice thereof, and, because both parties agree that nonpayment of said sums when due is a substantial breach of the lease, and because the payment of rent in monthly installments is for the sole benefit and convenience of LESSEE, then, in addition to any other remedies, the entire balance of rent due hereunder shall become immediately due and payable as liquidated damages.... LESSEE agrees to pay reasonable attorney's fees and/or administrative costs incurred by LESSOR in enforcing any or all obligations of LESSEE under this lease at any time....

\* \* \* \* \* \*

K. In the event that the entire balance of rent is accelerated pursuant to Section 20 above on account of the nonpayment of any sums due under this lease, provided LESSEE then fully cures such nonpayment and pays any other sums that are then due (including LESSOR's reasonable legal fees and costs) prior to the entry of a final judgment for the full accelerated rent, LESSOR agrees to reinstate the lease in full and to waive the acceleration of the rent, without waiving any rights which may arise with respect to any subsequent default. Time is of the essence.

Admetric occupied the Medford premises and paid its rent until August of 2001 when it experienced financial difficulties. By letter dated August 3, 2001, Cummings notified Admetric that failure to pay August rent and other charges, namely a trash invoice in the sum of $480 and an administrative fee in the sum of $35, within 10 days would "constitute a substantial default of the lease, require you to quit the premises and subject you to the rent acceleration provisions of Section 20." Because Admetric did not make the payment, Cummings filed a Summary Process Action in the Somerville District Court, Department of the Trial Court on August 25, 2001, seeking possession, monthly rent in the sum of $36,474.25, accelerated rent in accordance with Section 20 of the lease in the sum of $1,823,712.50, as well as $480 for trash removal and $35 for the administrative fee. The accelerated rent claimed by Cummings was approximately 80% of the total rent of $2,188,455 reserved under the five-year term of the lease.

After an initial hearing in the Somerville District Court, the parties, on September 6, 2002, executed a "Summary Process Agreement for Judgment" pursuant to which the parties agreed that judgment would enter for Cummings "for possession only" and that "this agreement for judgment is without prejudice to plaintiff's damages claim and defendant's defenses thereto and is not intended to alter the status quo of the damages claim and/or the defenses thereto."

In an Affidavit filed in conjunction with the summary process proceeding, Stephanie K. Marrus, a consultant to the Board of Directors of Admetric, indicated that she told Pravin Chaturvedi, President and Chief Executive Officer of Scion Pharmaceuticals, Inc. ("Scion"), that the space formerly occupied by Admetric was available and advised to contact a representative of Cummings. Cummings and Scion eventually negotiated a five-year lease pursuant to which Scion agreed to pay Cummings annual rent of $583,791 or $48,649.25 per month, commencing October 1, 2002, for the space formerly occupied by Admetric. Under the Scion lease, Cummings would receive over $500,000 more in rent than it would have received from Admetric over the balance of the original lease.

On October 30, 2001, Admetric filed a voluntary Chapter 7 petition. The Trustee removed the summary process proceeding

to this Court on January 18, 2002. Cummings claimed $437,691 as its damages as a result of the maximum claim allowable under 11 U.S.C. § 502(b)(6),[1] and it timely filed a proof of claim in that amount on March 11, 2002.

## III. POSITIONS OF THE PARTIES

### A. *Cummings' Motion for Summary Judgment*

Recognizing that 11 U.S.C. § 502(b)(6) caps its claim at one year's rent, or $437,691, Cummings argues that state law applies in determining the actual amount of its claim subject to the cap. Because its claim exceeds the cap, Cummings maintains that its claim should be allowed in the full amount permitted by § 502(b)(6). Specifically, it argues that the accelerated rent provision unambiguously reflects the parties' agreement as to how damages should be calculated and that paragraph K's exception—the payment of the arrearages before the entry of a final judgment for the accelerated rent—does not apply because no final judgment has entered.

Cummings predicates its argument on the decision of the Supreme Judicial Court in *Kelly v. Marx*, 428 Mass. 877, 705 N.E.2d 1114 (1999), and the "trend toward increased enforcement of stipulated damages" recognized by the United States Court of Appeals for the First Circuit in

*Honey Dew Assocs., Inc. v. M & K Food Corp.*, 241 F.3d 23 (1st Cir.2001). It asserts that the Trustee has the burden of establishing that the liquidated damages provision is unenforceable. It also asserts that she cannot meet her heavy burden as a matter of fact or law in voiding the liquidated damages provision set forth in Section 20 because its damages "in the event of a financial default at some unidentified point in the future were difficult to predict at the outset of the lease." It adds that the accelerated rent provision was not grossly disproportionate to a reasonable estimate of its damages at the time the lease was executed because the parties were sophisticated commercial entities and "damages consisting of rent for the balance of a lease term is hardly 'grossly disproportionate' to Cummings Properties' damages, in light of the substantial amount of comparable vacant space in Cummings Properties' portfolio at the time the lease was executed."

As further support for its position, Cummings cites several Massachusetts cases, including *Kimco of New England, Inc. v. Cliftex Corp.*, No. 97–1013, 1998 WL 409003 (Super.Ct. July 6, 1998). In that case, the court enforced an accelerated rent clause in a commercial lease for almost eight years worth of future rent. Cummings also cites two district court cases, *Cummings Properties, LLC v. Ha-*

---

1. Section 502(b)(6) provides the following:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—...

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates....

11 U.S.C. § 502(b)(6).

*bama, Inc.*, No. 0236CV0382, Slip op. (Salem Dist.Ct. April 29, 2002), and *Cummings Properties, LLC v. RBD Govern. Sys., LLC,* No. 0253SU0033, Slip op. (Woburn Dist.Ct. April 4, 2002), in which the courts awarded Cummings damages based upon accelerated rent clauses virtually identical to the one in the instant case. It adds that the law from other jurisdictions is consistent with Massachusetts law.

Finally, Cummings maintains 1) that it will not receive a windfall if its claim is allowed and it is permitted to keep the entire amount of the security deposit held under the lease because under Massachusetts law a "second look" is proscribed by *Kelly v. Marx*, 428 Mass. at 880, 705 N.E.2d 1114; and 2) that rents received in mitigation of a landlord's damages are deducted from actual damages and not the § 502(b)(6) cap, citing, *inter alia, In re All for A Dollar, Inc.*, 191 B.R. 262, 264–65 (Bankr.D.Mass.1996).

The Trustee filed an Opposition to Cummings' Motion for Summary Judgment, together with her Affidavit. She argues that a final judgment for the full amount of the accelerated rent has not entered. She adds that "[o]n or about July 16,2002, the Trustee, through her counsel, contacted Cummings and attempted to exercise her rights pursuant to paragraph K of the Rider to the Lease" and that Cummings refused to accept the proposed tender. Thus, she claims Cummings is estopped from pursuing its claim for liquidated damages. Moreover, she maintains that those damages are unenforceable in any event, for the reasons set forth in the Memorandum accompanying her Motion for Summary Judgment.

B. *The Trustees Motion for Summary Judgment*

The Trustee makes three arguments: 1) that the accelerated rent/liquidated dam-

ages provision is unenforceable; 2) that the enforcement of the provision would be contrary to public policy; and 3) that Cummings is not entitled to recover any damages in a summary process proceeding other than unpaid rent. First, the Trustee maintains that Cummings' actual damages were not "difficult to ascertain," one of the conditions for enforcement of liquidated damages in *Kelly v. Marx*, 428 Mass. at 880, 705 N.E.2d 1114. According to the Trustee, "one could reasonably estimate Cummings' damages as the sum of: (a) unpaid rent as of the date of the breach; (b) monthly rent until a replacement tenant is found; and (c) Cummings' expenses in re-leasing the premises—less any rental increase that Cummings would receive from the replacement tenant." The Trustee adds that the only circumstance in which the liquidated damages sum could ever bear a reasonable relationship to Cummings' expected damages would be if Cummings was never able to find a replacement tenant. Thus, in her view, the $1.8 million in accelerated rent is "grossly disproportionate to a reasonable estimate of actual damages."

The Trustee also argues that Cummings' damages claim is unconscionably excessive. She asserts that the liquidated damages do not compensate for losses suffered by Cummings, but instead serve as a penalty contrary to public policy. Additionally, the Trustee argues that because she removed a summary process proceeding to this Court the only relief available to Cummings is possession or payment for rent or use or occupation, not a judgment for accelerated rent or liquidated damages. Finally, the Trustee seeks the return of at least one-half of the security deposit.

In response, Cummings argues that the Trustee incorrectly utilizes the "second look," post breach approach rejected by the court in *Kelly v. Marx.* It also main-

tains that the accelerated rent provision is not unconscionable. It points out that Congress considered the appropriate amount of landlords' claims when it enacted 11 U.S.C. § 502(b)(6), and the Bankruptcy Code expressly provides that landlord's claims may include up to one year's worth of rent. Finally, it maintains that this Court has jurisdiction to consider its claim for accelerated or unpaid rent and that, if this Court were to accept the Trustee's contention, the Court would not have jurisdiction over her counterclaim for turnover of the security deposit.

## IV. DISCUSSION

### A. *Summary Judgment Standard*

The standard for summary judgment is well established. The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed.R.Bankr.P. 7056. In evaluating the Cross–Motions for Summary Judgment, the Court finds there are no material facts in dispute.

### B. *Burden of Proof*

▮ Under the Bankruptcy Rules, "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim." Fed.R.Bankr.P. 3001(f). The trustee has the burden of proving any affirmative defenses to the claim, such as usury or the statute of limitations. *See generally,* 4 *Collier on Bankruptcy,* ¶ 502.02[3][f] at 502–19 (Alan N. Resnick and Henry J. Sommer, eds., 15th ed. rev.2002). The United States Court of Appeals for the First Circuit has predicted that "if the Massachusetts Supreme Court were required to decide the issue ... it would assign the burden of proving the unenforceability of a liquidated damages clause to the party raising that defense." *Honey Dew Assocs., Inc. v. M & K Food Corp.,* 241 F.3d at 27. *See also, Cummings Properties, LLC v. Empire Technologies, Inc.,* No. 9767, 2002 WL 971807 (Mass.App.Div. May 6, 2002). In this case, that party is the Trustee. Accordingly, if the Trustee succeeds in establishing that the liquidated damages provision is unenforceable, the ultimate burden of proving the validity of its claim by a preponderance of the evidence rests on the claimant, Cummings.

### C. *Analysis*

▮ The Court shall address the jurisdictional arguments first. This Court recognizes that the instant action was initiated as a summary process proceeding and then removed to this Court by the Trustee. Nevertheless, to consider this action merely as a summary process proceeding at this juncture would elevate form over substance as the parties have essentially asked this Court to determine Cummings' proof of claim for purposes of distribution under 11 U.S.C. § 502(b)(6). Thus, this Court has jurisdiction to determine the claim under 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and 1334(a).

▮ With respect to the merits of Cummings' claim, both the Trustee and Cummings rely primarily on the Supreme Judicial Court's decision in *Kelly v. Marx.* In that case, the court considered whether sellers of residential real estate were entitled to retain a deposit for the purchase of real estate made by defaulting buyers in a sum that represented 5% of the sales price of the residential real estate, although the sellers subsequently sold their property for a higher price than that originally offered by the defaulting buyers. The Court

framed the issue as "whether enforceability of a liquidated damages clause is to be tested by analyzing the circumstances at contract formation, the prospective or 'single look' approach, or when the breach occurs, the retrospective or 'second look' approach." 428 Mass. at 879, 705 N.E.2d 1114. The Court stated that it rejected the " 'second look' approach" holding that "a liquidated damages clause in a purchase and sale agreement will be enforced where, at the time the agreement was made, potential damages were difficult to determine and the clause was a reasonable forecast of damages expected to occur in the event of a breach." *Id.* at 878, 705 N.E.2d 1114. The court determined that " 'where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced.' " *Id.* at 880, 705 N.E.2d 1114 (citing *A–Z Servicenter, Inc. v. Segall,* 334 Mass. 672, 675, 138 N.E.2d 266 (1956)). The court added "[l]iquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation." *Id.* (citing *Lynch v. Andrew,* 20 Mass.App.Ct. 623, 628, 481 N.E.2d 1383 (1985)).

■ This Court finds that Cummings has failed to submit credible evidence to rebut the Trustee's position that its damages were not difficult to ascertain at the time the lease was executed and that the accelerated rent/liquidated damages clause constituted an unreasonable estimate of its actual damages. The evidence that Cummings submitted was that it had a vacancy rate of about 10% at the time it executed the lease with Admetric. Emphasizing its inability to predict when and if Admetric might breach the lease at the time it executed the lease and the irrelevance of

Scion's decision to lease the space vacated by Admetric, it maintains that damages were difficult to ascertain. The Court disagrees for the following reasons.

In the first place, the Court finds that the record contains persuasive evidence of the damages Cummings might sustain, namely the security deposit, which represents four months of rent due under the lease. In other words, based upon the amount of the security deposit and the language of Section 2 of the lease, the Court infers that Cummings considered $146,000 a reasonable estimate of its damages, particularly because there is no evidence of expenses for improvements incurred by Cummings and the additional monthly charges incurred by Admetric appear to be nominal compared to the rent reserved under the lease. Unlike accelerated rent or liquidated damages, which may be uncollectible in whole or in part from a financially distressed entity, the security deposit represented money available to and held by Cummings which it could actually apply to satisfy or reduce any damages it might sustain. Thus, the Court infers from the amount of the security deposit that Cummings considered four months a reasonable estimate of both the amount of time it would take it to relet Admetric's space and its damages.

Secondly, Cummings, in response to the Trustee's arguments, failed to submit evidence of the turnaround time for leasing vacant space. Cummings did not attribute its 10% vacancy rate to defaults by tenants, and the vacant space in its real estate portfolio could be attributable to space available as a result of the expiration of leases at the end of their fixed terms, as well as space available as a result of defaults by tenants. A reasonable estimate of Cummings' damages could be and should have been tied to the average time it takes Cummings to relet space after it

becomes available. While Cummings may always have a vacancy rate of about 10%, a realistic estimate of its damages would be tied to the amount of time that space, comparable to the space occupied by Admetric, remained vacant and the average rent per square foot attributable to that space. The Court finds it highly unlikely that any particular rental space managed by Cummings remains vacant for three or four years at a stretch, which is the assumption implicit in the accelerated rent/liquidated damages provision.

In addition to ascertaining the average amount of time it took to relet property at the time the lease was executed, Admetric's financial statements and information about the nature and duration of its business, could have been utilized to obtain a reasonable forecast of actual damages. The inclusion of the accelerated rent/liquidated damages provision in Cummings' standard form of lease compels the conclusion that Section 20 is not a reasonable estimate of Cummings' actual damages for every entity to which it leases property, but a convenient mechanism to inflate its damages.[2] Thus, the Court finds that, contrary to Cummings' arguments, the accelerated damage provision is not a *reasonable* estimate of actual damages.

The Court also finds that the sum sought by Cummings is grossly disproportionate to a reasonable estimate of its damages and constitutes a penalty. In *Kelly v. Marx*, the liquidated damages constituted 5% of the purchase price. In the instant case, the liquidated damages are over 80% of the total rent reserved under the term of the five year lease. Even when capped, its damages are 20% of the total rent reserved under the term of the lease, a

percentage far higher than that considered by the court in *Marx*.

Moreover, this Court finds that the *Kimco* case cited by Cummings, a case in which the court found that an accelerated rent/liquidated damages provision was enforceable because damages were difficult or impossible to ascertain, is distinguishable from the instant case. In *Kimco*, the lessee, Cliftex Corp., was a tenant in two shopping malls, the Rockingham Mall and the Searstown Mall. In addition to being liable for monthly rental payments, real estate taxes, common area maintenance and marketing charges, the tenant was liable for "percentage rent" equal to 5% of its gross sales, if any, above certain amounts specified in its leases. In addition, Kimco had refurbished one of the stores it leased to Cliftex, expending over $100,000. These circumstances simply are not present in the instant case. While Admetric and Cummings are sophisticated business entities, as were the landlord and tenant in the *Kimco* case, the *Kimco* court's conclusion that the parties "should be held to the terms of the contract, including the mutually agreed-to liquidated damages clause," 1998 WL 409003 at *2, is not warranted in the instant case.

Similarly, the unpublished, district court cases from the Trial Court, District Court Department involving Cummings are not persuasive. In the *RBD Government Systems* case, the court determined that liquidated damages in the sum of approximately $175,000 was not excessive and represented a reasonable estimate of damages for breach of the lease at a time when the tenant was approximately $25,000 in arrears. In the *Habama, Inc.* case, the court, considering only the occu-

---

**2.** This inference is supported by the inclusion in Section 20 of references to insolvency proceedings. As Cummings is a sophisticated lessor, the Court presumes it is aware of how § 502(b)(6) would cap its claim for damages. Notably, its claim even after the § 502(b)(6) cap is 20% of the total rent reserved under the lease.

pancy rate of the building in which the tenant leased space, determined, without any meaningful analysis, that liquidated damages in the sum of $1,067,897.92 were enforceable. Moreover, in neither of these two cases was there evidence of mitigation of damages as in the instant case.

The Court finds substantial merit in the Trustee's second argument that the liquidated damages provision is contrary to public policy and constitutes a penalty. The liquidated damages provision makes a mockery of Cummings' duty to mitigate damages. In *Cummings Properties, LLC v. Empire Technologies, Inc.*, No. 9769, 2002 WL 971807 (Mass.App.Div. May 6, 2002), the court stated that "[w]hile a commercial landlord need not mitigate damages when the tenant elects to vacate the leased premises, such a duty would arise if the landlord terminates the lease by eviction. . . ." *Id.* at *2 (citations omitted). In *Krasne v. Tedeschi and Grasso*, 436 Mass. 103, 762 N.E.2d 841 (2002), the court stated:

> Termination of a lease ends a tenant's obligation to pay rent in the absence of any provision otherwise. 'If there is such a provision, the landlord is required to take reasonable steps to obtain a new tenant on terms that will mitigate the original tenant's liability as much as feasible under the circumstances. The cost to the landlord of mitigation is chargeable to the original tenant.'

436 Mass. at 846, 767 N.E.2d 578 (citing Restatement (Second) of Property, Landlord and Tenant § 12.1 comments g and i (1977)).

In the instant case, Cummings commenced a summary process proceeding to evict Admetric and obtained an Agreement for Judgment entitling it to possession that the parties executed on September 6, 2001. Scion executed a new lease for the premises approximately three weeks later and began renting the property on October 1, 2001. Despite this fact, Cummings argues that it is not unconscionable to require a sophisticated commercial entity to pay all of the rent that it agreed to pay, even though it relet the property within two months of Admetric's default, because it had a substantial amount of comparable vacant space. At oral argument, its counsel compared the situation to an airplane that was half full. He stated:

> If you're running an airplane and you have a hundred vacant seats and you sell fifty refundable tickets, the first fifty seats, and the person who sits in the first seats [sic] breaches, without any basis to breach, and doesn't pay you the non-refundable ticket price that you're entitled to receive, and you find Customer # 51 and happen to take them and put them in Seat # 1, does that make you whole for the fifty-one contracts that you're entitled to get? I think it doesn't because if you were whole you would be getting damages from # 1, and seats 2 though 51 paid.

This Court cannot discern the logic of this argument. Admetric was responsible for the space it leased from Cummings and is liable for damages as a result of its default. It is not responsible for other unoccupied property held by Cummings. Moreover, Scion chose to lease the premises formerly occupied by Admetric. It did not elect to lease other, perhaps comparable, space from Cummings. Although Cummings suggests that other property could have been leased by Scion, it was not. Accordingly, if Cummings is not required to mitigate its damages due to Scion's decision to lease the premises formerly occupied by Admetric, there is the potential for it to reap a windfall as a result of the Debtor's breach. In Cummings' view, it is entitled to accelerated rent in the approximate sum of $1.8 million

*plus* the benefit of Scion's performance under the lease. If this Court were to adopt Cummings' view, it would be sanctioning a windfall to Cummings to the detriment of other creditors of the bankruptcy estate.

By way of analogy, assume Cummings were an airline and had an airplane with 100 seats, 10 of which were normally empty. It sold tickets for 50 aisle seats to one customer who subsequently reneged. If Cummings were to find another customer that bought 50 aisle seats because it wanted or needed aisle seats, instead of the other available seats, Cummings would be in the same position it was in prior to the breach.

▆▆▆ This Court finds that the result advocated by Cummings is unconscionable and contrary to Massachusetts law requiring Cummings to mitigate its damages for the benefit of the lessee. The object of a damages for breach of contract is to put the non-breaching party in the position it was in prior to the breach. It is not to put the non-breaching party in a substantially better position. Although the Supreme Judicial Court has cautioned against the so-called "second look" approach, the Bankruptcy Code's policies of fairness to creditors and equality of distribution among similarly situated creditors compels this Court to recognize the actual economic harm suffered by Cummings, not simply rubber stamp a claim for damages far in excess of that harm and grossly disproportionate to any reasonable estimate of actual damages. Though cast as a liquidated damages provision, Section 20 operates, in reality, in this case, as a penalty. Cummings' liquidated damages bare no relation whatsoever to the damages it actually suffered, and, were this Court to allow its liquidated damages claim, even capped pursuant to 11 U.S.C. § 502(b)(6), there would be substantial detriment to other creditors. The policies of the Bankruptcy Code are public policies, and this Court will not countenance claims for artificially inflated damages on grounds that state law prevents a "reality check." Thus, the Court finds that the accelerated rent/liquidated damages claim is unenforceable because in this case it is contrary to public policy.

## V. CONCLUSION

In view of the foregoing, the Court finds that Cummings' liquidated damages claim is unenforceable. Accordingly, the Court shall deny Cummings' Motion for Summary Judgment. With respect to the Chapter 7 Trustee's Motion for Summary Judgment, the Court finds that Cummings may setoff Admetric's monthly rent totaling $72,948.50 for August and September, 2002, together with the charges totaling $515 and reasonable attorneys' fees. The Court shall enter an order requiring Cummings to submit a fee application to this Court and serve a copy on the Trustee and the United States Trustee. In the absence of objections, the Court shall enter a final judgment in favor of the Trustee.